[No. B163699. Second Dist., Div. Six. Aug. 29, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOAN FREDERICK et al., Defendants and Appellants.

COUNSEL

Janyce Keiko Imata Blair for Defendant and Appellant Joan Frederick.

John Steinberg for Defendant and Appellant Mercedes Navarrete.

Christine Vento for Defendant and Appellant Felix Navarrete.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson, Lawrence M. Daniels, Ana R. Duarte and Karen Bissonnette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GILBERT, P. J.—Here the crime, an endless chain, proves to be an oxymoron. (Pen. Code, § 327.)[1] The conviction of defendants ends the chain, but not the losses to countless victims.

Among other things, we conclude the elaborate chain scheme devised by defendants to bilk money from various hapless victims also involves securities fraud. We also conclude that the crime of filing a false income tax return does not involve a "taking" for the purpose of sentence enhancement.

Joan Frederick, Mercedes Navarrete, and Felix Navarrete appeal a judgment following conviction of operating an endless chain scheme; conspiracy to commit grand theft; grand theft; sale of a security without qualification (Mercedes and Felix);[2] using a false statement in the sale of a security (Felix); using a scheme to defraud in the sale of a security (Mercedes and Felix); and filing a false income tax return (Mercedes and Felix). (§§ 327, 182,

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

[2] To ease the reader's task, we shall refer to the Navarretes by their first names.

subd. (a)(1), 487, subd. (a), 186.11, subd. (a)(2) [excessive taking in pattern of related felony conduct], & 12022.6, subd. (a)(4) [excessive taking]; Corp. Code, §§ 25110, 25540, subds. (a) & (b), 25401, & 25541; Rev. & Tax. Code, § 19705, subd. (a)(1).) We strike the section 12022.6 taking enhancement regarding count 28, filing a false income tax return, but otherwise affirm.

## FACTS AND PROCEDURAL HISTORY

In 2000, Mercedes founded La Luz de Oro, meaning "The Light of Gold." (LLDO.) She became chief executive officer and president of the later-formed corporation, and Felix became secretary. Mercedes's daughter, Joan Frederick, became chief financial officer and treasurer. LLDO held meetings to recruit members, who were required to pay meeting and membership fees, join various programs, and recruit additional members. Programs included purchases of telephone calling cards, credit/debit cards, cellular telephones, ownership ("co-dueno") interests in LLDO, Mitsubishi automobiles, and "dream homes." Mercedes and LLDO representatives assured members that LLDO would make the payments on the automobiles and dream homes. They also represented that members would receive investment returns on the calling cards, credit cards, and "co-dueno" interests.

On March 7, 2001, plainclothes Los Angeles police officers attended and secretly videotaped an LLDO meeting at La Hacienda Real nightclub in Los Angeles. Several hundred members attended and gave cash and checks to LLDO representatives. Armed security guards were present. The meeting resembled a revival meeting as excited members gave testimonials regarding LLDO benefits. During the meeting, Mercedes stated that LLDO would pay for the members' new automobiles and dream homes. She also stated that a prospective member could purchase an ownership interest in LLDO, entitling him to a share of its income. Felix, described as "a man of few words," sat on the stage. The prosecutor played portions of the videotape at trial.

Undercover Detective John Rodriguez spoke with Pedro Miramontes at the LLDO meeting. Miramontes identified himself as a leader of LLDO and gave Rodriguez a sales presentation that included an LLDO "co-owner membership agreement." Miramontes stated that LLDO members shared in its earnings ("a share in the profits"). He also stated that LLDO would purchase an automobile and a home for Rodriguez if he joined the LLDO programs and recruited additional members. Miramontes described LLDO as "an investment business," and stated that Rodriguez's "commitment" required a $140 monthly purchase of prepaid telephone calling cards. Miramontes explained the "co-owner" program as an "investment" program in which the investor acquires "a share in or . . . a co-partner[ship] in the company." Rodriquez secretly videotaped his conversation with Miramontes and the prosecutor played a portion of the videotape at trial.

Several weeks later, Rodriguez interviewed Mercedes. She stated that approximately 25,000 members worldwide belonged to LLDO. Mercedes described LLDO as a telecommunications company that earned income from telephone calling cards, cell phones, and Internet connections.

In December 2000, Lona Luckett, a Better Business Bureau employee, investigated LLDO following many consumer complaints. On February 15, 2001, Luckett spoke with Felix. She opined that he was operating a pyramid scheme and recommended that he cease operations. Luckett also recommended that Felix consult an attorney because he was not a licensed investment advisor. Felix responded that he had been involved previously with similar programs, that "he was going to make it work," and that "[t]his time everyone would get paid."

Felix often signed the checks given as payments to LLDO leaders. Felix was also a director of LLDO, and an application for a federal employer tax identification number indicated that he was a principal officer.

### *"Co-Dueno" Program*

The "co-dueno" or "co-owner" program provided that members would become co-owners in LLDO in exchange for certain payments and for recruiting additional members. LLDO co-owners were entitled to a share of its annual profits.

### *Mitsubishi Automobile Program*

In 2000, Mitsubishi Motor Sales had a promotion that permitted a qualified purchaser to purchase a new automobile with no downpayment and no payments for six months to one year. At the time, Mitsubishi Motor Credit, the finance subsidiary of Mitsubishi Motor Sales, had an "auto express" credit approval program conferring credit approval responsibility upon the dealerships.

Juan Alvarado was a member and a "leader" of LLDO. In 2000 and 2001, Assael Mitsubishi in Duarte employed Alvarado as an assistant sales manager. Miller Mitsubishi in Van Nuys employed Carlos Vargas, an LLDO member, as a salesman. LLDO representatives referred LLDO members to Alvarado and Vargas at their respective dealerships. Alvarado and Vargas sold Mitsubishi automobiles to "qualified" LLDO members—those who paid sums to LLDO, participated in other LLDO programs, and recruited new members. Alvarado and Vargas completed credit applications for LLDO members, falsely stating their employment and incomes. They assured prospective

buyers that LLDO would make their automobile payments after they purchased an automobile. In fact, LLDO did not make any payments. (Counts 10–15 [grand theft].)

Mitsubishi Motor Credit repossessed 156 automobiles purchased by LLDO members. It lost nearly $2.25 million after selling the repossessed automobiles and receiving approximately $375,000 "negotiated settlement" from the two dealerships. Mitsubishi Motor Credit later contacted LLDO members who had surrendered vehicles, and offered to expunge derogatory credit reporting regarding the transactions.

On April 18, 2001, police officers executed search warrants upon LLDO offices and the Navarretes' residence in Arleta. They later seized nearly $2 million in cash and cashier's checks. An investigative audit revealed that approximately $9 million passed through LLDO bank accounts from April 2000 through June 2001.

When police officers executed the search warrant at the Navarretes' residence, only Frederick and a housekeeper were present. From time to time, Frederick was a guest in her mother's home. Frederick requested permission to leave and take her black duffel bag that was on the bed in her sister's bedroom. When police officers looked inside the unmarked duffel bag, they discovered nearly $14,000 in currency. Police officers also found $10,000 in currency in a safe at the residence.

Later that day, Frederick obtained three cashier's checks from LLDO bank accounts, totaling nearly $2 million. One check for nearly $1.3 million was payable to her, another check for $500,000 was payable to the LLDO corporation, and a third check for $150,000 was payable to an attorney. Police officers later seized the bank accounts pursuant to warrant, however, and the checks were not paid.

Many LLDO members paid significant sums toward its programs, but did not receive cellular telephones, credit/debit cards, or the promised returns. (Counts 3–15 [grand theft].) Many LLDO members also were unaware that Mercedes had been convicted of theft in Michigan in 1999, involving a similar scheme. Those who had automobiles repossessed complained of damaged credit ratings. Some received investment returns, but not in the amounts or with the frequency promised. A certified public accountant examined LLDO's cancelled checks and determined that members received approximately $3.6 million overall.

Bonnie Youngdahl, a former attorney with the California Department of Corporations, testified at trial as an expert witness concerning California

securities law. She explained that the Department of Corporations enforces the law regarding the raising of investment capital. Youngdahl opined that many factors were involved in determining whether a particular offering was a "security." She stated that the determination does not depend upon the name of the interest sold, but rather concerns the "economic reality" of the offering. This means looking "through the form to the substance of the transactions." Youngdahl also stated that reasonable persons could disagree whether a particular investment is a security.

A special agent of the California Franchise Tax Board reviewed the Navarretes' 2000 income tax return. The agent testified that the Navarretes owed $195,679 in income taxes for the year 2000, based upon LLDO's assumed illegal and unreported activities. (Count 28.)

The fourth amended grand jury indictment charged nine individual defendants with operating an endless chain scheme, conspiracy to commit grand theft and grand theft, and violation of California securities laws, among other counts. (§§ 327, 182, subd. (a)(1), & 487, subd. (a); Corp. Code, §§ 25110, 25540, subds. (a) & (b), 25401, & 25541.) The indictment also charged financial taking enhancements. (§§ 12022.6, subd. (a)(4) [$2,500,000], 1203.045, subdivision (a) [$100,000], & 186.11, subd. (a)(2) [$500,000].)

Prior to trial, the trial court denied Frederick's motion to suppress evidence of the cash found in the duffel bag during execution of the search warrant. (§ 1538.5.) The court found that police officers could lawfully search the nondescript bag for weapons before allowing Frederick to leave. The court reasoned that the officers "would put themselves at undue risk if they don't look inside for officer safety." The court also found that Frederick was more than a casual visitor to the residence, and that the searching police officer's testimony was credible. In sum, it ruled that the plain view doctrine lawfully permitted police officers to seize the currency.

The trial court severed the trial of Mercedes, Felix, and Frederick from the remaining defendants. Defendants Juan Alvarado and Carlos Vargas were convicted after trial; other defendants entered nolo contendere pleas to particular counts. We decided the appeals of Alvarado, Vargas, and others in unpublished decisions. (*People v. Vargas* (Jan. 26, 2005, B164912) & *People v. Miramontes* (Jan. 10, 2006, B174318).)

The jury convicted Frederick and the Navarretes of operating an endless chain scheme, conspiracy to commit grand theft, and 13 counts of grand theft. (§§ 327, 182, subd. (a)(1), & 487, subd. (a).) It found that the excessive taking allegations of sections 186.11, subdivision (a)(2), 1203.045, subdivision (a), and 12022.6, subdivision (a)(4), were true. The jury also convicted Mercedes

and Felix of selling a security without qualification, using a scheme to defraud in the sale of a security, and filing a false income tax return. (Corp. Code, §§ 25110, 25540, subds. (a) & (b), & 25541; Rev. & Tax. Code, § 19705, subd. (a)(1).) It convicted Felix of making a false statement in the sale of a security.[3] (Corp. Code, §§ 25401 & 25540, subd. (b).)

The trial court sentenced Mercedes to 20 years' imprisonment, consisting of an upper term for count 27 (using a scheme to defraud in the sale of a security), consecutive terms for the excessive taking enhancements of sections 186.11, subdivision (a)(2), and 12022.6, subdivision (a)(4), and consecutive or concurrent sentencing for the remaining counts. It sentenced Frederick to 12 years' imprisonment, consisting of an upper term for count 1 (operating an endless chain scheme), and consecutive upper terms for the excessive taking enhancements. The trial court imposed but stayed sentence on the remaining counts pursuant to section 654. The trial court sentenced Felix to 10 years' imprisonment, consisting of a middle term for count 25 (sale of security without qualification), and consecutive terms for the excessive taking enhancements. It then suspended execution of sentence, dismissed the probation restrictions of sections 1203.044 and 1203.045, and granted Felix five years' probation with terms and conditions. The trial court later described Felix as the "least culpable of anyone."

The trial court also ordered Mercedes and Felix to pay approximately $10 million restitution, and Frederick to pay approximately $9.75 million restitution. Restitution claimants included individual LLDO members, Mitsubishi Motor Credit, and the California Franchise Tax Board (Mercedes and Felix).

Frederick, Mercedes, and Felix appeal and contend that the trial court erred by: 1) denying the suppression motion; 2) precluding expert testimony concerning endless chain schemes; 3) not reinstructing regarding the elements of an endless chain scheme prior to jury deliberations; 4) instructing that sale of an unqualified nonexempt security is a general intent crime; 5) not instructing regarding theft by trick or device, rather than theft by false pretenses; 6) not modifying CALJIC No. 17.01 to require victim unanimity; 7) not defining "related felony conduct" within the section 186.11 taking enhancement instruction; 8) not staying Mercedes's sentence for counts 3 through 15 [grand theft] pursuant to section 654; 9) imposing upper term and consecutive term sentences in violation of *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]; 10) applying the section 12022.6 taking enhancement to count 28, filing of a false tax return (Rev. & Tax. Code, § 19705, subd. (a)(1)); and 11) imposing and staying

---

[3] The jury neglected to complete a verdict form for this particular count (count 26) regarding Mercedes.

sentence upon Mercedes for count 26 (using a false statement in the sale of a security). They also contend that there is insufficient evidence of a security within Corporations Code section 25019, and the excessive taking enhancements.

Each appellant joins the factual summaries and legal contentions made by the others, as applicable. (Cal. Rules of Court, rule 13(a)(5); *People v. Castillo* (1991) 233 Cal.App.3d 36, 51 [284 Cal.Rptr. 382].)

## DISCUSSION

### I.

Frederick argues that the trial court erred by denying her motion to suppress evidence of the currency seized from her duffel bag during execution of the search warrant. She points out that the search warrant neither mentioned her nor specified seizure of currency. Frederick adds that she lived in San Diego and infrequently stayed at her mother's home. She asserts that insufficient evidence supports the trial court's factual findings that the police officer searched the duffel bag to protect officer safety and discover contraband. Frederick points out that the officer gave several reasons for searching the duffel bag—fruits of the crime and officer safety. She adds that the officer had no evidence connecting her to illegal LLDO activities or to the Navarretes. (*People v. Berry* (1990) 224 Cal.App.3d 162, 169 [273 Cal.Rptr. 509] [circumstances must suggest a relationship between the person, the place searched, and the illegal activities].) Frederick argues the error is prejudicial because the "case against [her] was thin." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

In reviewing a trial court's ruling on a suppression motion, we defer to the trial court's factual findings that are supported by substantial evidence. (*People v. Hughes* (2002) 27 Cal.4th 287, 327 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878].) The trial court " 'sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences[.]' " (*People v. Needham* (2000) 79 Cal.App.4th 260, 265 [93 Cal.Rptr.2d 899].) Whether a search is constitutionally reasonable, however, is a legal question upon which we exercise our independent judgment. (*People v. Hughes, supra,* 27 Cal.4th 287, 327.)

■ Searching police officers may seize items not listed in the warrant provided that the items are in plain view while the officers are lawfully in the location they are searching, and the incriminating nature of the items is immediately apparent. (*People v. Kraft* (2000) 23 Cal.4th 978, 1043 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Under certain circumstances, police officers may search the personal effects of a person who is more than a casual visitor, but not a resident of the premises. (*People v. Berry, supra*, 224 Cal.App.3d 162, 168.) "If the circumstances suggest a relationship between the person and place sufficient to connect the individual to the illegal activities giving rise to the warrant, search of the person's property on the premises is permitted." (*Id.*, at p. 169.)

Sufficient evidence supports the trial court's finding that the officer acted reasonably in searching the duffel bag. The bag contained no identifying marks and officers were not required to believe Frederick's statement that the bag belonged to her. Frederick was more than a mere visitor to her mother's home. She ate meals and stayed there from time to time. The duffel bag was on the bed in the bedroom in which she stayed as a guest. Thus, she had " 'more than just a temporary presence . . .' " in the residence. (*People v. Howard* (1993) 18 Cal.App.4th 1544, 1555 [23 Cal.Rptr.2d 212] [defendant's purse legally searched where she was found in bed with another defendant during execution of warrant].)

Moreover, police officers could search the bag for weapons to protect their safety. Operation of LLDO involved large amounts of checks, cash, and money orders; armed security guards were present at membership meetings. A courier carrying the cash and financial instruments might carry a weapon to safeguard the items. The trial court expressly determined the credibility of the officer's reason for searching the bag. We do not redetermine questions of credibility. (*People v. Needham, supra*, 79 Cal.App.4th 260, 265.)

In any event, any error in admitting evidence of the currency is harmless beyond a reasonable doubt. (*People v. Memro* (1995) 11 Cal.4th 786, 847 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [standard of review when evidence obtained from unlawful search and seizure].) After leaving her mother's home, Frederick went to the bank and obtained three cashier's checks totaling nearly $2 million. The largest check for $1.3 million was payable to her; another check for $150,000 was payable to an attorney. By comparison, evidence of the $14,000 within the duffel bag is neither significant nor prejudicial.

## II.

Frederick contends that the trial court erred by precluding expert testimony regarding an endless chain scheme, a complicated subject beyond the jury's common experience. She points out that Evidence Code section 805 allows expert opinion that "embraces the ultimate issue to be decided by the trier of fact." She asserts that the trial court's ruling denied her due process of law and the assistance of counsel because the ruling restricted her right to present a defense. (*People v. Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275].)

During the examination of expert witness and lawyer Thayer Lindauer, the trial court ruled that his testimony regarding endless chain schemes was limited to the common features or hallmarks of a scheme. The court ruled that the question whether LLDO was an endless chain scheme was an "ultimate question for the jury to decide." Thus, the court permitted Lindauer to testify whether a particular aspect of an endless chain scheme was "consistent with his experience," but not whether a particular hypothetical entity was an endless chain scheme.

■ Evidence Code section 805 provides that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." Nevertheless, an expert opinion is inadmissible "if it invades the province of the jury to decide a case." (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972 [105 Cal.Rptr.2d 88].) Such evidence is "wholly without value" to the trier of fact. (*Ibid.*) The determination whether an expert witness's opinion bears upon or decides an ultimate issue in the case is sometimes a difficult decision, and " 'a large element of judicial discretion [is] involved.' " (*People v. Wilson* (1944) 25 Cal.2d 341, 349 [153 P.2d 720].)

The trial court did not abuse its discretion by limiting the opinions of prosecution and defense expert witnesses regarding endless chain schemes. The trial court properly permitted the expert witnesses to testify regarding the indicia or aspects of an endless chain scheme, but not whether LLDO was, in fact, an endless chain scheme. Thus, Lindauer testified that based upon his expertise and knowledge, endless chain schemes are not secret organizations, they do not sell products, and they compensate a participant for bringing in a new participant. He also stated that he had no knowledge of an endless chain scheme that received $9 million from its participants, yet returned 60 to 85 percent of the funds.

The trial court also properly restricted Lindauer and other expert witnesses from instructing upon the law of endless chain schemes. (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178–1184 [82 Cal.Rptr.2d 162].) Calling lawyers as " ' "expert witnesses" ' " to give opinions as to the application of law to particular facts " 'usurps the duty of the trial court to instruct the jury.' " (*Id.,* at p. 1179.)

The trial court's evidentiary limitations did not deny Frederick her constitutional right to the assistance of counsel and to present a defense. Lindauer testified at length concerning the indicia of an endless chain scheme, and opined that a plan that returned 60 to 85 percent of its revenues to members was not an endless chain scheme. The trial court's ruling was not a " '*blanket exclusion*' " of evidence that stripped Frederick of her defense. (*People v. Page* (1991) 2 Cal.App.4th 161, 185 [2 Cal.Rptr.2d 898].)

### III.

Mercedes and Felix argue that there is insufficient evidence to support the convictions of counts 25, 26, and 27, violations of California securities law. (Corp. Code, §§ 25110 (count 25), 25401 (count 26 [Felix only]), & 25541 (count 27).) They contend that LLDO programs were not securities within the meaning of Corporations Code section 25019, because LLDO members actively participated in the venture. (*People v. Figueroa* (1986) 41 Cal.3d 714, 738–739 [224 Cal.Rptr. 719, 715 P.2d 680] [corporate securities law requires that an investor risk capital through his investment].) Mercedes and Felix rely upon LLDO's requirement that members must recruit seven new members to argue that members were active participants in the venture.

■ Corporation Code section 25019 defines a "security" expansively, and includes "participation in any profit-sharing agreement" or an "investment contract," whether or not a written document evidences the investment. (*Ibid.*; ["All of the foregoing are securities whether or not evidenced by a written document."].) An "investment contract" is " 'a contract or a transaction in which a person entrusts money or other capital to another, with the expectation of deriving a profit, income or some financial benefit from a business enterprise, the failure or success of which is dependent upon the managerial efforts of other persons.' " (*People v. Smith* (1989) 215 Cal.App.3d 230, 235 [263 Cal.Rptr. 684].) It is a question for the trier of fact whether a particular investment is a security. (*Id.,* at p. 236.) Here the trial court properly instructed with the definition of investment contract set forth in *People v. Smith, supra,* 215 Cal.App.3d 230, 235.

Sufficient evidence supports the jury's finding that the LLDO "co-dueno" program was a security. LLDO members testified that they believed that they were investors and co-owners of LLDO. Miguel Gutierrez testified that LLDO representatives told him a co-owner investment meant that he would be "a part of the company . . . like an owner." Jose Grant received a videotape from LLDO in which Mercedes stated that members "share in the company's earnings." Omar Sotowade testified that he considered LLDO an investment in which he expected a return. Julia Parkin believed LLDO was an investment company. Yolanda Rosales invested in the "co-dueno" program because LLDO "was presented to [her] as an investment company." Alison Conover invested in the "co-dueno" program to receive "a profit share . . . at the end of the year." Israel Menjivar believed that he would be a co-owner based upon Mercedes's statements. LLDO leader Pedro Miramontes gave undercover Officer Rodriguez a "co-owner agreement," and stated that LLDO members received "a share in [LLDO's] profits." This is reasonable and credible evidence from which a reasonable trier of fact could find defendants guilty of the securities counts beyond a reasonable doubt. (*People v. Kipp*

(2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450] [standard of review of substantial evidence].)

Mercedes, Felix, and Frederick carried out the managerial functions of LLDO. They alone made the important management decisions essential to LLDO's operations. LLDO members, many of whom were poor and uneducated, were not in charge and could not influence the management of LLDO. The success or failure of LLDO rested upon defendants' managerial efforts, not the efforts of its members. (*People v. Smith, supra,* 215 Cal.App.3d 230, 235 [general rule].) "When an investor entrusts money or other consideration to a promoter through any arrangement but retains substantial power to affect the success of the enterprise, he has not 'risked capital' within the meaning of the Corporate Securities Law." (*People v. Figueroa, supra,* 41 Cal.3d 714, 738–739.) Here LLDO investors did not retain "substantial power" to affect the success of LLDO. (*Ibid.*)

## IV.

Appellants argue that the trial court denied them their constitutional rights to due process of law and to a jury trial by failing to reinstruct at the conclusion of evidence regarding the elements of operating an endless chain scheme (count 1). (§ 327.) They point out that three weeks of evidence elapsed between preinstruction and deliberations, and assert that jurors likely forgot the required elements of the crime. (*People v. Valenzuela* (1977) 76 Cal.App.3d 218, 222 [142 Cal.Rptr. 655] [better practice to reinstruct regarding credibility where three days of trial elapsed, counsel argued credibility of witnesses, and counsel paraphrased credibility instruction during summation].) Appellants also assert that the trial court did not include the instruction among the written instructions given at the conclusion of trial. They argue the error relieved the prosecution of proving the requisite elements of the crime. Appellants claim that the error is federal constitutional error and prejudicial per se, or alternatively, not harmless beyond a reasonable doubt.

Following opening statements by counsel, the trial court instructed regarding the elements of the crime of grand theft, and stated that it would instruct from time to time during trial. The court also then provided the jurors with written instructions concerning grand theft.

Several days later, the trial court instructed concerning operating an endless chain scheme, informing counsel beforehand that the instruction was "taken straight from the Penal Code." The court also provided jurors with "some more [written] instructions . . . and they incorporate also counts 1 [operating an endless chain scheme] and count 2 [conspiracy to commit grand theft]."

The court then instructed: "The Defendants are accused in count 1 of having violated 327 of the Penal Code, operating an endless chain scheme. . . . Every person who willfully contrives, prepares, sets up, or operates any endless chain scheme is guilty of a crime. [¶] An 'endless chain' means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme, or for the chance to receive compensation when a person introduced by the participant introduces a new participant. [¶] In order to prove this crime, each of the following elements must be proved: [¶] Number One, a person willfully contrived, prepared, set up, or operated a business entity or other organization. [¶] Number Two, the business entity or other organization gives compensation to some person. [¶] Number Three, the compensation is given by the business to the person for the chance to receive compensation for introducing one or more additional persons into participation in the scheme, or, for the chance to receive compensation when a person introduced by the participant introduces a new participant. . . ." The court read this instruction as the jurors followed along with their seven-page handouts.

Thereafter, the trial court instructed the jury immediately prior to summation, but did not reinstruct concerning the elements of operating an endless chain scheme. During the prosecutor's summation, however, he discussed the instruction's three elements: "One, a person set up or operated a business entity or other organization. Two, the organization gave compensation to some person. Three, compensation was given by the business for a chance to receive compensation for introducing an additional person or persons into the scheme."

■ Section 1093, subdivision (f), permits the trial court to instruct "[a]t the beginning of the trial or from time to time during the trial . . . ." It does not require a rereading of all instructions at the conclusion of trial. (*People v. Chung* (1997) 57 Cal.App.4th 755, 759 [67 Cal.Rptr.2d 337].) "Breaking instructions into phases of the trial does not tax the attention span of jurors, provides timely and useful information to jurors as the trial progresses, and arguably benefits the parties." (*Id.,* at p. 760.)

For several reasons, the trial court did not err by not rereading the endless chain instruction. First, defense counsel did not object to the early instruction, and did not request rereading of the instruction at the conclusion of the evidence. (*People v. Chung, supra,* 57 Cal.App.4th 755, 760.) Second, the trial court provided jurors with a written instruction when it instructed during the prosecutor's case-in-chief. (*Ibid.*) Third, the prosecutor summarized and discussed the essential elements of the instruction during summation. (*Id.,* at pp. 759–760.) Fourth, the instruction accurately defines the crime of operating an endless chain scheme.

## V.

Felix argues that the trial court erred by not instructing that count 25, sale of security without qualification, requires knowledge that the security was unqualified and not exempt. (Corp. Code, § 25110 [securities must be registered with the Department of Corporations unless exempt].) He asserts that the error violated his right to a jury trial and denied him due process of law, because the LLDO programs did not appear to be securities as commonly understood. Felix adds that expert witness evidence at trial differed whether LLDO programs were securities. He points out that the Department of Corporations declined to prosecute the LLDO matter because it was questionable whether an offer or sale of securities was involved.[4] Felix asserts that Mercedes, not he, primarily managed LLDO. He argues the error is not harmless beyond a reasonable doubt.

During the pendency of this appeal, our Supreme Court decided the issue of scienter and Corporations Code section 25110. (*People v. Salas* (2006) 37 Cal.4th 967 [38 Cal.Rptr.3d 624, 127 P.3d 40].) Pursuant to our invitation, Felix has submitted additional briefing in light of *Salas*.

Corporation Code section 25110 proscribes the offer or sale of a security that has not been qualified with the Department of Corporations, unless the security is exempt from qualification. At trial, the parties stipulated that LLDO had not applied for qualification with the Department of Corporations.

In *People v. Salas, supra,* 37 Cal.4th 967, our Supreme Court held that "a seller who believes reasonably and in good faith that a security is exempt is not guilty of the crime of unlawful sale of an unregistered security." (*Id.,* at p. 971.) Guilty knowledge is not an element of the crime, however. (*Ibid.*) "Rather, a defendant's reasonable good faith belief that a security is exempt from registration is an affirmative defense on which the defense bears the initial burden of proof." (*Ibid.*) Thus, the trial court must instruct concerning a defendant's good faith belief "only when the defense has presented evidence sufficient to raise a reasonable doubt that the defendant knew, or was criminally negligent in failing to know, that the security was not exempt." (*Id.,* at p. 972.) This rule presents no unfairness or hardship to a defendant because his knowledge or lack of knowledge is peculiarly within his personal knowledge. (*Id.,* at p. 982.)

The trial court was not required to instruct regarding defendants' good faith belief because defendants did not present any evidence that they had a

---

[4] The trial court properly did not permit evidence of the Department of Corporation's decision not to prosecute.

reasonable good faith belief that they were not selling securities or that the securities were exempt from qualification. Defendants' knowledge or lack of knowledge regarding LLDO is peculiarly within their personal knowledge. An inference drawn from differing expert witness opinions regarding the general nature of a security is insufficient to support an instruction here concerning defendants' knowledge or lack of knowledge regarding LLDO. (*People v. Salas, supra*, 37 Cal.4th 967, 982.) Defendants did not bear their initial burden of proof. (*Id.,* at p. 972.)

## VI.

Frederick asserts that the trial court erred by not instructing, sua sponte, concerning theft by trick or device, rather than theft by false pretenses. (*People v. Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271] [crime of theft by false pretenses involves fraudulent acquisition of title and possession; theft by trick or device involves only fraudulent possession of property].) She contends that the LLDO victims transferred only possession, not ownership, of the money paid to LLDO because they expected a particular product in return. Frederick claims the error is prejudicial because she presented a defense that LLDO would have paid all members had the police not frozen LLDO bank accounts, and precluded further marketing. In other words, she asserts that the prosecution would have been unable to prove beyond a reasonable doubt that she intended " 'to convert [the funds] to [her] own use and to permanently deprive the owner [thereof].' " (*People v. Traster* (2003) 111 Cal.App.4th 1377, 1390 [4 Cal.Rptr.3d 680] [victim gave computer consultant checks to purchase software licenses; he absconded with funds instead].)

■ The crime of theft by trick or device requires: 1) obtaining possession of property of another by some trick or device; 2) intent by the wrongdoer to convert it to his own use and to permanently deprive the owner thereof; and 3) transfer of possession but not title to the wrongdoer. (*People v. Traster, supra*, 111 Cal.App.4th 1377, 1390.)

The crimes of theft by trick or device and theft by false pretenses are similar. (*People v. Traster, supra*, 111 Cal.App.4th 1377, 1387.) Theft by trick or device involves a transfer of possession only; theft by false pretenses involves a transfer of title and possession. (*Ibid.*) Generally, if a victim gives money to a wrongdoer with the understanding that it will be spent for a particular purpose, title does not pass to the wrongdoer. (*Id.,* at p. 1388.) Under those circumstances, the wrongdoer may have committed the crime of theft by trick or device. (*Ibid.*)

The trial court did not err. Theft by false pretenses was the prosecution's theory of the case against the LLDO officers, and sufficient evidence supports

the convictions. Members joined LLDO by paying meeting fees, buying programs for ownership interests, dream homes, Mitsubishi automobiles, cell phones, telephone calling cards, and credit cards, as well as by recruiting new members. Unlike *People v. Traster, supra*, 111 Cal.App.4th 1377, victims did not give LLDO funds to purchase specific articles. Moreover, the amounts of money given by each victim were insufficient to purchase the items promised, including a dream home and Mitsubishi automobile.

In any event, any error is harmless beyond a reasonable doubt. (*People v. Traster, supra*, 111 Cal.App.4th 1377, 1389 [technical error where jury instructed on wrong theory of theft].) The prosecutor proved the additional element of transfer of ownership for the crime of theft by false pretenses. The evidence also established no possibility that LLDO could repay its thousands of investors. Moreover, shortly after execution of the search warrant, Frederick drained the LLDO bank accounts, in part by obtaining a $1.3 million check payable to her.

## VII.

Frederick and Mercedes argue that the trial court erred by not instructing that the jury must agree unanimously upon the victims of the grand theft, counts 10 through 15. (*People v. Laport* (1987) 189 Cal.App.3d 281, 283 [234 Cal.Rptr. 399]; *People v. McNeill* (1980) 112 Cal.App.3d 330, 335–336 [169 Cal.Rptr. 313] [particularized unanimity instruction required where single count alleged four victims of assault].) They concede that the trial court instructed with CALJIC No. 17.01 regarding counts 10 through 15 that "in order to return a verdict of guilty . . . all jurors must agree that [defendants] committed the same act or acts . . . ." Frederick and Mercedes assert the error denies them due process of law and impairs their constitutional right to jury unanimity. They contend the error is not harmless beyond a reasonable doubt because they presented different defenses to each victim. (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1500–1502 [50 Cal.Rptr.2d 407] [standard of review regarding unanimity instruction error].)

■ In a criminal case, the jury must agree unanimously that the defendant is guilty of a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641].) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*) Thus, when a defendant is charged in a single count with several offenses, and the evidence shows that he committed more than one of the offenses, the trial court must instruct with CALJIC No. 17.01. (*People v. Laport, supra*, 189 Cal.App.3d 281, 283.)

Here the verdict forms state the names of LLDO members and/or a particular Mitsubishi dealership in the alternative. The trial court instructed with CALJIC No. 17.01 ("Verdict May be Based on One of a Number of Unlawful Acts"). Defendants did not request the trial court to amplify or modify CALJIC No. 17.01 to instruct upon the necessity of juror agreement regarding a specific victim. Although the trial court is obliged to instruct upon general principles of law, a defendant must request any clarifying or amplifying instructions. (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 974–975 [14 Cal.Rptr.2d 311].)

Waiver aside, any error is harmless under any standard of review. (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 185–188 [7 Cal.Rptr.3d 483] [failure to give unanimity instruction tested under *Chapman v. California, supra,* 386 U.S. at p. 24]; *People v. Vargas* (2001) 91 Cal.App.4th 506, 562 [110 Cal.Rptr.2d 210] [*People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] is applicable standard].) By agreeing upon which act constituted the theft in counts 10 through 15, the jury necessarily determined the specific victim of each count. Moreover, the evidence established that the Mitsubishi automobile salesmen were LLDO members who falsified the credit applications of LLDO members referred to them by LLDO leaders. There is no reasonable basis for a juror to conclude that Frederick and the Navarretes defrauded the dealers, but not the individual LLDO members who participated financially in the LLDO programs to qualify for a new automobile.

## VIII.

Mercedes asserts that the section 186.11 enhancement instruction was inadequate because the trial court did not define the phrases "related felonies" and "pattern of related felony conduct." She contends the error is not harmless beyond a reasonable doubt. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324–326 [109 Cal.Rptr.2d 851, 27 P.3d 739].)

██ Section 186.11, subdivision (a)(2), provides additional punishment where a "pattern of related felony conduct" by the defendant involves a taking exceeding $500,000. Thus, the trial court instructed in part that the "elements" of the section 186.11 enhancement include: "1. A person is guilty of two or more related felonies and; 2. A material element of each of these felonies for which the person is found guilty is fraud or embezzlement; and 3. The felonies involve a pattern of related felony conduct."

The trial court properly instructed regarding the section 186.11 enhancement. During trial, the court twice instructed in the language of the section 186.11 statute. Generally, the language of a statute defining a crime or defense may serve as the instruction. (*People v. Rodriguez* (2002) 28 Cal.4th

543, 546 [122 Cal.Rptr.2d 348, 49 P.3d 1085].) The parties may request amplification or further definition. (*Ibid.*)

Moreover, unless the terms of an instruction have a technical meaning peculiar to the law, the trial court need not instruct further with definitions. (*People v. Bland* (2002) 28 Cal.4th 313, 334 [121 Cal.Rptr.2d 546, 48 P.3d 1107].) Here the phrases "pattern of related felony conduct" and "related felonies" have no peculiar technical meaning, and are phrases commonly understood without further definition. (*People v. Rodriguez, supra,* 28 Cal.4th 543, 547 ["recurring access" phrase within child molestation statute has no technical meaning and is commonly understood].) There is no error.

*People v. Sengpadychith, supra,* 26 Cal.4th 316, is distinguishable. There the trial court did not instruct that the commission of one or more statutorily enumerated felonies would trigger a street gang enhancement. (*Id.,* at pp. 319–324.) *Sengpadychith* did not involve the subdefinition of commonly understood words or phrases in an instruction.

### Sentencing Contentions

### IX.

Mercedes asserts that the trial court was required to stay sentence on counts 3 through 15 [grand theft], pursuant to section 654, because it stayed sentence on those counts when sentencing Frederick. She points out that the trial court sentenced her four months following Frederick's sentencing, and the trial judge remarked that she could not "really remember everything that [she] ruled on [in the earlier sentencing]." Mercedes argues that the trial court made an implied finding of an indivisible course of conduct when it applied section 654 to Frederick. (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638 [259 Cal.Rptr. 549] [implied finding regarding divisibility of course of conduct inheres in judgment].) She contends that she held but a single intent and objective—to take money from LLDO members—in committing counts 3 through 15.

We interpret the record differently. At Frederick's sentencing, the trial court ruled upon defendants' motions regarding application of section 654 to counts 3 through 15. The trial court denied the motions. The trial judge stated: "[T]here is a course of conduct here that is divisible in time, which I think gives rise to multiple violations and punishment, appropriately so under 654 and [*People v. Gaio* (2000) 81 Cal.App.4th 919 [97 Cal.Rptr.2d 392]]." After further argument regarding section 654, the trial judge ruled: "I think that each count is divisible in time, and therefore, giving rise to multiple

punishments, if necessary." Shortly thereafter, however, the trial court sentenced Frederick and inexplicably stayed sentence for counts 3 through 15 pursuant to section 654. The trial judge then stated that sentence for those counts "must be stayed pursuant to Penal Code section 654."

The trial court either misspoke or extended leniency to Frederick, a behind-the-scenes participant in LLDO. There is "no reason . . . why the mistake should be perpetuated and carried into the sentencing of [a codefendant]." (*People v. Nelson* (1987) 194 Cal.App.3d 77, 80 [239 Cal.Rptr. 287].) The grand theft counts involved specific individuals who contracted to purchase Mitsubishi automobiles at either Assael Mitsubishi or Miller Mitsubishi. The offenses concerned acts committed at different times. (*People v. Gaio, supra*, 81 Cal.App.4th 919, 935 [offenses separated by time allow defendant an opportunity to reflect upon his conduct].) Substantial evidence supports the trial court's express ruling that the counts were divisible in time, warranting multiple punishments. (*Ibid.*) Moreover, the trial court stated during sentencing that Mercedes's crimes involved many victims, she took advantage of poor and vulnerable people, she does not harbor remorse, and LLDO was a fraudulent and well-planned scheme.

## X.

Mercedes argues that there is insufficient evidence of the excessive taking enhancements of section 186.11, subdivision (a)(2) ($500,000) and 12022.6, subdivision (a)(4) ($2.5 million). She relies upon expert witness accounting testimony that LLDO made payments to its members or purchased telephone calling cards with most of the $9 million passing through LLDO bank accounts in 2000 and 2001.

Mercedes also argues that she is not liable for the Mitsubishi Motor Credit losses because dealer salesmen falsified the credit applications and caused the losses. She claims that in the trial of the salesmen defendants, the prosecutor argued that the salesmen alone were responsible for Mitsubishi Motor Credit losses.

Sufficient evidence supports the excessive taking enhancements. Millions of dollars passed through LLDO bank accounts in 2000 and 2001. Frederick obtained three cashier's checks for nearly $2 million in April 2001. She also attempted to leave the Navarrete home with nearly $14,000 cash. A safe in the home also contained $10,000 cash. Police officers seized approximately $2.3 million (including the cashier's checks) in LLDO bank accounts. Although LLDO may have purchased $2.2 million in telephone calling cards for its members, it did exercise dominion and control over the funds, and it is proper to include them in calculating any excessive taking amounts. "We

think the Legislature did not intend that the application of section 12022.6 should depend upon the fortuitous circumstances of whether the police were able to recover stolen property or the victim was able to establish a civil claim for the return of property or its proceeds traced by some circuitous route [footnote omitted]." (*People v. Ramirez* (1980) 109 Cal.App.3d 529, 539 [167 Cal.Rptr. 174] [obvious purpose of § 12022.6 enhancement "is to deter large-scale crime."].) Thus, apart from any losses to Mitsubishi Motor Credit, the excessive taking enhancements are supported by substantial evidence.

Moreover, the Mitsubishi Motor Credit losses are not attributable to the dealer salesmen alone, and the prosecutor did not assert such in a later trial. We have examined the records in each appeal and conclude that the prosecutor did not argue inconsistent theories of liability. Without the promises made by Mercedes, LLDO members would not have gone to Mitsubishi dealerships and purchased expensive automobiles, believing that LLDO would make the payments. LLDO members also paid substantial sums to LLDO to qualify for the automobile program, which was a central and important part of LLDO's programs.

## XI.

Frederick and Mercedes contend that *Blakely v. Washington, supra,* 542 U.S. 296, *Apprendi v. New Jersey, supra,* 530 U.S. 466, and federal constitutional principles of due process of law require that the jury determine beyond a reasonable doubt the factual findings used by the trial court to impose upper and consecutive terms of imprisonment.

In *People v. Black* (2005) 35 Cal.4th 1238 [29 Cal.Rptr.3d 740, 113 P.3d 534], our Supreme Court held that imposition of an upper term of imprisonment or a consecutive sentence pursuant to section 669 does not violate a defendant's constitutional right to trial by jury. (35 Cal.4th at p. 1244.) *Black* reasoned that "in operation and effect, the provisions of the California determinate sentence law simply authorize a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." (*Id.,* at p. 1254.) Imposition of upper term and consecutive sentencing does not violate defendants' constitutional rights to a jury trial. (*Id.,* at p. 1244.)

## XII.

Mercedes and Felix assert that the section 12022.6, subdivision (a)(4) taking enhancement does not apply to count 28, filing a false income tax return. (Rev. & Tax. Code, § 19705, subd. (a).) Specifically, they argue that

filing a false income tax return is not a "taking" within section 12022.6, subdivision (a), nor is the false filing part of "a common scheme or plan" for purposes of aggregating losses within subdivision (b). Mercedes and Felix describe the false filing as distinct from the LLDO crimes, and point out the difficulties of proving the amount of loss to the government. They add that the purpose of the taking enhancement is· to punish severely " 'those in positions of trust . . . who steal large amounts of money.' " (*People v. Nasalga* (1996) 12 Cal.4th 784, 796, fn. 10 [50 Cal.Rptr.2d 88, 910 P.2d 1380].)

■ Section 12022.6, subdivision (a)(4), provides for a four-year sentence enhancement where "any person takes, damages, or destroys any property in the commission . . . of a felony . . . [¶] . . . [¶] . . . [i]f the loss exceeds two million five hundred thousand dollars ($2,500,000). . . . ." Subdivision (b) permits the aggregation of losses arising "from a common scheme or plan" based upon multiple allegations of takings in an accusatory pleading.

Mercedes, Felix, and the People rely on *People v. Crow* (1993) 6 Cal.4th 952 [26 Cal.Rptr.2d 1, 864 P.2d 80]. In *Crow,* defendant committed welfare fraud. He received funds to which he was not entitled. The county's loss was computed by calculating the amount it would have paid had the fraud not occurred. The application of 12022.6 to aggregate losses was properly applied because the county proved its loss exceeded $25,000.

■ Unlike the crime of welfare fraud in *Crow,* the crime of filing a false income tax return is not part of a common scheme or plan to take property within the meaning of section 12022.6, subdivision (b). The common scheme or plan here involved completed acts of theft and fraud against thousands of LLDO members as well as automobile dealerships. The Navarretes' filing of a false income tax return was a separate act occurring at a different time against a different victim. The plain language of the statute does not permit application of the taking enhancement here to count 28. We therefore strike it, and direct the trial court to amend the abstract of judgment accordingly, and forward it to the Department of Corrections.

## XIII.

Mercedes contends that the trial court erred by imposing and staying sentence for count 26 (using a false statement in the sale of a security) because the jury did not return a verdict concerning that count. The Attorney General concedes, pointing out that the trial court dismissed count 26 when the jury neglected to complete a verdict form for that count. The trial court stated: "[T]here were so many verdict forms . . . we must have had over 150

verdict forms [and it] was overlooked by the Court and by counsel. And the Court will find that that count should be dismissed because there was no verdict findings . . . ."

There is no error to correct, however. Neither the court minutes nor the abstract of judgment reflect imposition of sentence for count 26.

We strike the section 12022.6 enhancement concerning count 28, but otherwise affirm.

Yegan, J., and Perren, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 15, 2006, S146584.