Filed 5/15/14  P. v. Morales CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049335 |
| v. | (Super. Ct. Nos. RIF153760 & RIF1100412) |
| STEVEN MORALES, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Michael B. Donner, Judge.  Affirmed as modified.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Steven Morales, Jr., (defendant) of knowingly making false statements to State Compensation Insurance Fund (SCIF) for the purpose of obtaining lower workers' compensation insurance rates (Ins. Code, § 11880, subd. (a); count 1), one count each of knowingly making false statements to California Contractor's Network (CCN) and Granite State Insurance (GSI) for the purpose of lowering workers' compensation insurance rates (Ins. Code, § 11760, subd. (a); counts 2 & 3, respectively), failure to collect or pay unemployment insurance taxes (Unemp. Ins. Code, § 2118.5; count 4), and perjury (Pen. Code, § 118; count 6).[1] He was found not guilty of money laundering (§ 186.10, subd. (a); count 5).

The jury also found true the following sentence enhancements: (1) A loss exceeding $1.3 million with respect to count 1 (§ 12022.6, subd. (a)(3)), a loss of $65,000 with respect to count 2 (§ 12022.6, subd. (a)(1)), and losses of over $200,000 with respect to both counts 3 and 4 (§ 12022.6, subd. (a)(2)). The jury also found true an enhancement for the commission of two or more felonies involving a pattern of related felony conduct in a taking of over $500,000 (§ 186.11, subd. (a)(2)).

The trial court sentenced defendant to a total determinate term of seven years, consisting of the two-year low term for count 1, plus three years for the size of the loss (exceeding $1.3 million) and two years for the pattern of related felony conduct enhancement (§ 186.11, subd. (a)(2)). The court imposed concurrent sentences on the remaining counts and enhancements.

Defendant challenges the sufficiency of the evidence to prove he made, or caused another to make, written or oral misrepresentations to reduce workers' compensation premiums (counts 1-3), willfully failed to collect or withhold unemployment insurance (count 4), and intentionally committed perjury (count 6). He also claims the court had a sua sponte duty to define "willfully" as it appears in the jury

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

instruction for count 4, and assuming defendant prevails on one or more of his arguments, he also claims the evidence is insufficient to prove he committed a pattern of felony activity in a loss exceeding $500,000. We conclude only one of defendant's contentions has merit, reverse the conviction on count 2, affirm the judgment in all other respects.

## PROCEDURAL HISTORY

In 2005, defendant's son, Brian Todd Morales[2] formed a company called Brian Todd Morales, DBA Shelby Framing. Later that same year, he created a corporation called Shelby Development Incorporated (Shelby Development), DBA Shelby Framing.[3] Another company, Shelby Construction was incorporated in 2007, and in February 2008, Shelby Construction Employee Leasing (SCEL), a limited liability corporation was formed. SCEL listed defendant as its sole owner.

In December 2009, the Riverside County District Attorney filed a felony complaint alleging defendant and Brian committed the following crimes: (1) defrauded SCIF for an amount exceeding $1.3 million between March 2005 through September 2007; (2) defrauded workers' compensation insurer, CCN, for an amount exceeding $65,000 from March through October 2006; (3) defrauded workers' compensation insurer Granite State Insurance (GSI); and (4) willfully failed to collect and truthfully account for employee withholding taxes to the Employment Development Department (EDD).

According to the complaint, the crimes came to light as a result of a 2008 EDD audit. The EDD notified the Riverside District Attorney's Office that multiple individuals who claimed to work for Shelby Framing had filed for unemployment insurance, but the EDD had no record of Shelby Framing reporting the individuals as employees, nor had the company collected withholding taxes for these employees.

---

[2] We use Brian's first name to distinguish him from defendant and intend no disrespect.

[3] Brian Todd Morales, DBA Shelby Framing and Shelby Development are collectively referred to as the "Shelby Companies."

3

In early 2010, Brian pled guilty to all charges and admitted all enhancements. In July, the Riverside County District Attorney's Office filed a seven count, amended felony complaint (Super. Ct. Riv. County, 2010, case No. RIF153760) that alleged the following: (1) defendant defrauded SCIF for an amount exceeding $1.3 million from March 2005 through September 2007 (count 1); (2) defendant defrauded workers' compensation insurer, CCN, for an amount exceeding $65,000 from March through October 2006 (count 2); (3) defendant defrauded workers' compensation insurer GSI for an amount exceeding $200,000 from December 11, 2007 through July 10, 2008 (count 3); (4) defendant knowingly and willfully failed to collect and truthfully account for employee withholding taxes to the EDD for a loss exceeding $200,000 (count 4); (5) money laundering in violation of section 186.10, subdivision (a) on February 14, 2007 (count 5); (6) filing false claims in violation of section 550, subdivision (b) in May 2008 (count 6); and (7) perjury (§ 118a).

Following a lengthy preliminary hearing, defendant was held to answer on all counts. An information realleging all seven counts and various enhancements was filed later that month (Super. Ct. Riv. County, 2010, case No. RIF153760). Defendant successfully moved to dismiss counts 1 through 6 (§ 995 [motion to dismiss]), and the Riverside County Superior Court stayed proceedings in case No. RIF153760 pending the outcome of People's petition for writ of prohibition or mandate.

In December 2011, the Court of Appeal issued a preemptory writ of mandate directing the superior court to set aside its dismissal of counts 1 through 4, which the superior court complied with in March and affirmed the trial court's order as to counts 5 and 7, and issued a stay on count 6. The second amended information in case No. RIF153760 realleged six of the seven original counts and enhancements. The second amended information omitted former count 6. In February 2011, the Riverside District Attorney's Office filed a separate information, alleging defendant committed one count

4

of money laundering (Super. Ct. Riv. County, 2010, case No. RIF1100412). The two cases were later consolidated for trial.

The trial court referred the matter to the probation department for the preparation of a pre-plea report, but any possibility of a plea agreement vanished when the People insisted defendant accept a state prison sentence. In August 2012, all parties announced ready for trial. The evidentiary portion of the trial started on August 31, 2012. The jury began deliberations on September 20 and concluded the following day. In November, the trial court sentenced defendant to seven years in state prison and this appeal followed.

**FACTS**

*1. Trial Evidence*

*a. Background*

The prosecution presented 18 witnesses and admitted over 100 exhibits. The witnesses included a collection of former employees of the Shelby Companies and employees with SCIF, CCN, Paychecks, the Contractor's State Licensing Board (CSLB), EDD, and the Department of Insurance. Brian testified for the defense.[4]

The Shelby Companies employees who testified universally claimed that defendant represented himself as, and acted like, a co-owner of Shelby Framing and Shelby Development. Although the companies seemed to be separate entities, Shelby Framing and Shelby Development shared a common address and bank account. Defendant had many roles in these company, including acting as a project estimator, personnel, and payroll. Either Brian or defendant would distribute employee paychecks, and defendant often signed payroll checks. Defendant interviewed potential employees, developed personnel policies for how to treat minor workplace injuries, communicated

---

[4] Brian's plea to the court resulted in a four-year prison sentence, but he appears to have been released from prison sometime before defendant's trial in April 2012.

5

with injured employees, and intervened when employee paychecks bounced. He also intervened during CCN's investigation.

Brian and defendant were authorized to issue checks on Shelby Development's bank accounts, although Brian testified defendant was not involved in payroll, other than to sign employee paychecks, nor was he involved in any decisions about withholding taxes. Defendant did put $125,000 into the company when Shelby Development started having trouble meeting its payroll. According to Brian, defendant dealt with creditors when Shelby Development's checks started to bounce with some regularity.

### b. Count 1: SCIF from March 31, 2005 through September 12, 2007

Brian obtained a contractor's license in the early 1990's, and he worked in construction as a sole proprietor from 1993 to approximately 2004. In late 2004 and early 2005, at the height of the real estate boom, Brian created a corporation called Brian Todd Morales, DBA Shelby Framing. Brian had decided that he wanted to develop general contracting projects with his uncle, Tim Denton, and he hired Denton to be Shelby Framing's vice-president of operations and secretary/treasurer of the company. According to Brian, Denton was responsible for workers' compensation insurance for the Shelby Companies' employees. However, Brian filed for workers' compensation insurance from SCIF in March 2005. At the time, he reported that Shelby Framing had no employees, and he claimed 100 percent ownership interest in Shelby Framing.

In late 2005, defendant started working for Brian. Around the same time, Brian contacted a payroll company (Paychecks) to handle Shelby's payroll. He also hired Bob Dyar, a neighbor and friend, to work as an assistant supervisor, under defendant's tutelage. Brian estimated that by the later part of 2005 and early 2006, he had around 90 employees.

SCIF issued a policy to Shelby Development in March 2005, and it was in force from 2005 to 2007. However, Shelby Development never reported having any

6

employees. Sometime in 2006, Brian prepared false payroll documents and submitted them to SCIF. An audit revealed Shelby Development owed over $151,000 in unpaid premiums. Brian sent a check for this amount, but the check was returned due to insufficient funds. SCIF canceled its policy in September 2007. SCIF conducted a subsequent, more thorough audit and discovered Shelby Development owed SCIF over $1.5 million in unpaid premiums.

Phillis Shorts, a claims adjuster for SCIF, testified workers' compensation insurance is mandatory for companies with employees. SCIF provides insurance where an employer cannot obtain insurance through other companies. She explained that workers' compensation insurance premiums are primarily determined by the type of work an employee performs and the employee's salary. However, SCIF will consider the employer's business longevity, its past workers' compensation costs, if any, and any prior losses.

SCIF requires an insured to report minor work-related injuries within five business days and serious injuries within 24 hours. Companies must also prepare and submit payroll reports each month because SCIF uses these reports to determine premiums. Companies must also maintain specified records in order to facilitate an audit.

In the spring of 2007, SCIF decided to audit Shelby Development and requested the company's payroll records. The auditor contacted Denton and Manuel Bazan, and asked them to get payroll records for March 1, 2006 to the middle of May 2007. After the audit, SCIF determined Shelby Development owed $150,000 for workers' compensation insurance for the period specified. Brian signed a check for the full amount based on Gary McKinsey's cash flow projections, and the check bounced. In August or September, SCIF cancelled Shelby Development's workers' compensation insurance policy.

Brian admitted he knowingly made fraudulent statements to SCIF for the purpose of maintaining Shelby Developments workers' compensation insurance, and he

pled guilty to making fraudulent statements to SCIF for the purpose of obtaining workers' compensation insurance. He denied misappropriating the money McKinsey put into the company.

Brian testified he did not contact SCIF to report the employees he hired during the time SCIF provided workers' compensation insurance because he expected SCIF to conduct an audit and bill him for any difference "eventually." He also admitted he had "not paid attention like [he] should have" to his businesses.

*c. Count 2: CCN from March 4, 2006 through October 30, 2006*

As 2006 progressed, Brian's corporation was growing rapidly. Brian described his work as "a constant battle to get paid." In March, Brian directed Denton to shop for less expensive workers' compensation insurance through carriers other than SCIF. By April, Brian knew his business was growing beyond his control. He hired another individual, Kerry Holmes, to help him set up the corporate structure and hire qualified people to handle various aspects of the business.

In April, a new company, Shelby Development, Inc., DBA Shelby Framing filed for workers' compensation insurance through CCN. Denton filled out the application, although Brian admitted signing the document. Denton claimed Shelby Development had 45 employees, plus or minus an additional 15 employees. He also stated Shelby Development was a new company with no previous insurance, notwithstanding that he knew this fact was false and material to CCN's decision to provide workers' compensation insurance.

According to Brian, CCN required monthly payroll reports, which were prepared by Denton. In June 2006, Shelby Development reported having nine employees. In July, the company claimed 16 employees. Both figures were inaccurate. At some point, Brian became aware of Denton's underreporting.

In September 2006, Brian hired Bazan and Delores Morales, another member of defendant's family. In October, CCN terminated coverage. In November, he

8

hired McKinsey. Shortly thereafter, Paychecks discontinued their payroll service, and Brian signed a contract with Automatic Data Processing, Inc., (ADP). However, he also testified that to his knowledge, defendant had never seen the CCN application, nor had Brian and defendant ever discussed workers' compensation insurance. In fact, Brian recalled discussing workers' compensation insurance with Denton.

McKinsey was hired as vice-president of operations, but later became president and chief operating officer for the Shelby Companies. He worked for the Shelby Companies from 2006 through 2008. McKinsey testified Brian and defendant were co-owners of the Shelby Companies, and both Brian and defendant interviewed him. According to McKinsey, "[Defendant] had a great deal of control on the framing side, the framing company, and Brian exercised a lot of control in the development company."

McKinsey also testified that defendant was present in meetings where workers' compensation insurance was discussed, and that defendant participated in these meetings. McKinsey verified that workers' compensation insurance is considered a "hard cost" of construction projects, just like material, labor, and liability insurance, something any project estimator should take into account, and defendant was a Shelby Companies job estimator. When McKinsey asked defendant for the company's workers' compensation insurance policy, defendant made excuses and never produced the policies. As McKinsey stated, "I asked [defendant] and Brian and were told different stories."

Bazan testified Shelby Framing hired him to be their human resources manager in 2006. His job duties included ensuring employee compliance with the companies' policies and payroll, and he dealt with workers' compensation insurance and job-related injuries. Bazan knew Shelby Framing and Shelby Development paid employees from a single bank account. During his tenure, Bazan managed from 20 to over 100 employees depending on the jobs. Although he hired around 20 employees for the Shelby Companies, defendant and Brian would hire other people without his

9

knowledge. When employee paychecks started to bounce, defendant interacted with the employees.

Bazan also said the officers of the corporation were responsible for maintaining current workers' compensation insurance. Although he did not know which person was ultimately responsible, Bazan testified he believed the duty fell to either defendant or Brian because "they told me they were the owners." According to Bazan, defendant directed him to handle minor jobsite injuries by directly paying health care providers and not reporting the injuries to the workers' compensation carrier. Bazan followed directions because defendant claimed to be an owner of Shelby Framing, and Bazan reported to both Brian and defendant. When asked if Brian had been "the actual brain" behind the Shelby Companies, Bazan testified, "I had no way of knowing who was actually in charge. I knew that they both were the ones over everybody else there."

In time, Bazan began to work for Shelby Development. He testified about an incident involving defendant and a CCN representative. Bazan and the representative were meeting when defendant barged into Bazan's office and angrily asked Bazan who he was talking to. Defendant made a point of telling the representative that he was the owner of the company and he started an argument.

Jerry Austin, an employee of CCN, testified that Shelby Development applied for and received coverage for workers' compensation insurance in May 2006. Austin went to the Shelby Companies' office in October to discuss an injured worker. It was during a meeting with a Shelby Companies' employee that Austin realized the Shelby Companies had more employees than claimed, and that the Shelby Companies had workers' compensation insurance from SCIF and CCN. During Austin's meeting with a Shelby Companies' employee, defendant came into the room, grabbed the Shelby Companies' certificate of insurance from SCIF, and said to Austin, "what are you doing with that? He pulled it out of my hand. He says, I'm the owner here. Get out of my office." Later, SCIF advised CCN of their audit results, and the two companies

10

apportioned the loss between them. According to Austin, the Shelby Companies owed CCN $169,149 for the six months they provided workers' compensation insurance.

2. *Count 3: GSI from December 11, 2007 through July 10, 2008*

Austin also testified that the Shelby Companies applied for workers' compensation from GSI, and that GSI issued a policy to Shelby Construction on December 11, 2007. The application stated Shelby Construction was owned by Brian, a new business, and had six full-time employees. GSI cancelled the workers' compensation policy effective July 2008 for nonpayment of premiums. An audit revealed that Shelby Development owed $287,979 in unpaid premiums.

Brian explained that when the real estate market collapsed in early 2007, many of builders who signed contracts with Shelby Development "walked away from projects." Employee paychecks started bouncing. Defendant entered into an agreement with the Salsa Market to cash their payroll checks, but then hold them until Shelby Development had sufficient funds on the advice of either Denton or McKinsey. However, Brian denied he entered this agreement for the purpose of money laundering. Brian testified that around this time McKinsey started to prepare weekly cash flow projections.

Brain claimed he and Denton tried to locate another workers' compensation insurance provider. In November 2007, Brian filed an application with a third carrier, GSI, a subsidiary of American International Group (AIG). Brian had abandoned Shelby Development to form a new company, Shelby Construction. He completed an application for workers' compensation insurance for Shelby Construction with GSI and he claimed the business had only six employees at the time.

3. *Count 4: January 1, 2005 through December 31, 2008*

In 2008, Brain created SCEL to avoid creditors. Because SCEL was not characterized as a construction company, Brian did not use his contractor's license and

11

did not obtain workers' compensation insurance, even though he was creating SCEL for the sole purpose of protecting income and paying Shelby Construction employees.

Although Bazan had never dealt with EDD in his capacity as human resources director, EDD contacted him when various Shelby Companies' employees began claiming unemployment insurance benefits. After the Shelby companies ceased operations, EDD contacted Bazan, and he turned over two cases of documentation and paperwork regarding the unemployed workers.

Nick Kinkom, a former investigator with EDD, testified that EDD administers unemployment insurance benefits, disability benefits, and state payroll taxes. Employers are required to withhold payroll taxes and remit those taxes to EDD. They are also required to file quarterly reports regardless of the number of employees.

SCEL registered with EDD on April 9, 2008. SCEL never reported having any payroll, and it failed to file reports for the second and third quarters of 2008. However, SCEL checks were used to pay employees of the Shelby Companies.

In September 2008, after over 100 former Shelby Framing employees filed for unemployment insurance benefits, Kinkom contacted Susan Nila, an investigator from the Riverside County District Attorney's Office. Nila later discovered that Shelby Framing had never reported having any employees, and Shelby Development had reported having a payroll for 2005 to 2006 only. Nila reviewed Shelby Construction's file with the Secretary of State. According to the Secretary of State, Shelby Construction, applied for corporate status in January 2007 and was licensed in August 2007. However, Shelby Construction claimed no employees when filing its application with the Secretary of State. A subsequent audit revealed the Shelby Companies had employed and not withheld unemployment taxes for over 400 people. This equated to an over $300,000 tax debt.

Brian conceded that he had worked for defendant during his youth, and that he and his father had a certain level of expertise in the construction industry. In 1994,

12

Brian obtained his own contractor's license, and formed his own company, around the time defendant's contractor's license had been revoked. Brian denied that defendant was a co-owner of Shelby Framing, although he admitted defendant may have claimed to be a co-owner, and that defendant was listed as a corporate officer for Shelby Framing and Shelby Construction.

Brian also maintained defendant knew nothing about the workers' compensation policies, notwithstanding the fact that Brian admitted discussing the company's financial problems with him, and that defendant handled some of the employees whose checks had bounced, fielded some of the angry creditor calls, signed several company documents, including paychecks, and claimed to be a co-owner of Brian's companies. He also admitted his various companies had over 400 employees cumulatively. However, Brian claimed defendant knew nothing about the financial condition of the various companies.

## 4. Count 6: Perjury

Count 6 charged defendant with perjury. The prosecution presented evidence that defendant had a contractor's license in the 1990's, but that it was revoked in 1993 after defendant and two of his clients got into a dispute over money paid and work performed.

In February 2008, defendant applied for a new contractor's license. Question No. 12 of the application stated, "'To the best of your knowledge, has anyone on this application or any company the person was a part of, or any immediate family member of the applicant ever received a citation from the [CSLB] or had a contractor's license or other professional or vocational license denied, suspended or revoked by this state or elsewhere. Check no if the license was suspended due to lack of bond, workers' compensation qualifier or family support. If checked yes, you are required to attach a statement detailing the events to this action.'"

13

Defendant checked the "no" box for question No. 12, under penalty of perjury. However, on the face page of the application, defendant wrote three, six-digit numbers in response to question No. 5b, which asked for "QUALIFYER'S EXISTING/PREVIOUS CSLB LICENSE NUMBER(S)."

The CSLB responded to the application in April 2008, stating that defendant's application was unacceptable because he had not used the same name as he had in the past, and the CSLB had records that indicated he had previously held a contractor's license that had been revoked. The CSLB requested defendant provide "a detailed statement on a separate piece of paper explaining why you answered NO to [question No. 12]." In October, the CSLB sent defendant a letter informing him that he had exceeded the 90-day time limit for submitting a response to the agency's April request for clarification, and that his application was void.

## DISCUSSION

### 1. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to prove counts 1 through 4 and 6. "'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'" (*People v. Stanley*

14

(1995) 10 Cal.4th 764, 792-793.)  Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; *People v. Thomas* (1992) 2 Cal.4th 489, 514.)

*a. Counts 1 through 3*

Count 1 charged defendant with a violation of Insurance Code section 11880, subdivision (a) between March 2005 and September 2007.  "Insurance Code section 11880, subdivision (a) makes it a felony to knowingly make a 'false or fraudulent statement . . . of any fact material to the determination of the premium, rate, or cost of any policy of workers' compensation insurance issued or administered by the State Compensation Insurance Fund for the purpose of reducing the premium, rate, or cost of the insurance.'"  (*People v. Petronella* (2013) 218 Cal.App.4th 945, 954.)

Counts 2 and 3 charged defendant with violating Insurance Code section 11760, subdivision (a).  That section uses the same statutory language as Insurance Code section 11880, but it applies only to non-SCIF workers' compensation insurance providers like CCN (count 2) and GSI (count 3).

With respect to counts 1, 2 and 3, defendant argues the evidence is sufficient to prove the crimes were committed, but not that he aided and abetted Brian in the commission of the crimes.  Defendant summarizes the evidence and his argument in this way:  "[Defendant] acknowledges that the record contains substantial evidence that he had an ownership interest in one or more . . . Shelby Companies.  The record also contains substantial evidence that [defendant] exerted significant control over the operations of the Shelby Companies.  And the record even shows that [defendant] was an officer in some of the Shelby Companies.  One could argue that this is substantial evidence that Appellant *could have* caused false representations to be made in connection with efforts to obtain workers' compensation.  But evidence that [defendant] could have

15

done so is not evidence that he in fact did cause false representations to be made. [¶] In sum, the record contains no evidence that [defendant] personally made false statements to workers' compensation insurance provider, or caused someone else to make false statements to an insurance provider." (Original italics and capitalization.)

Precisely because there was no evidence defendant *personally* made fraudulent statements, the District Attorney relied on an aiding and abetting theory. "'[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-296, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561.) "Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment. Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fns. omitted; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

In this case, Brian admitted he filled out the applications for workers' compensation insurance, and he reviewed and signed the periodic reports required by each carrier. Thus, the question is whether sufficient evidence supports the jury's conclusion defendant knew Brian made false statements to SCIF, CCN, and GSI in order to obtain lower workers' compensation costs, and that defendant intentionally facilitated and encouraged Brian to make written or oral false statements with the intent to defraud workers' compensation insurance providers. We think the evidence is sufficient on these points as to counts 1 and 3, but not count 2.

True enough, there is scant evidence defendant actually touched any workers' compensation paperwork. In fact, the evidence is to the contrary. Nevertheless,

16

throughout the relevant time periods, defendant assumed a management role that included distributing paychecks, signing payroll checks, interviewing potential employees, developing personnel policies, communicating with injured employees, and making alternative arrangements when employee paychecks bounced. And finally, defendant assumed responsibility for bidding new projects for the Shelby Companies. This is important because McKinsey testified workers' compensation insurance is considered a hard cost of construction projects. So in order to be a competent project estimator, defendant had to consider the associated employee costs to ensure profitability.

With respect to count 1, we find the testimony of Denton and Austin persuasive. They testified that during their meeting in May 2006, a time when Austin realized the Shelby Companies had more employees than it claimed, defendant barged into Bazan's office and angrily asked Bazan who he was talking to, and then made a point of telling Austin that he was the owner of the company. Under these facts, a reasonable juror could conclude defendant knew Brian made false statements to SCIF, and defendant's actions and intervention encouraged Brian to continue filing fraudulent reports with SCI, all with the requisite intent to defraud.

In addition, we find sufficient evidence to support the jury's verdict on Count 3. The jury reasonably could infer defendant used his company, SCEL, to help Brian hide the Shelby Companies payroll so Brian could deceive GSI about the number of workers he employed and receive lower insurance rates. This, too, is sufficient to show defendant's knowledge and intent to encourage Brian in his ongoing criminal enterprise.

However, count 2 presents a problem. CCN terminated its coverage shortly after Austin's meeting with defendant. The Shelby Companies filed for workers' compensation insurance from GSI in December 2007. The fraud involved Brian's claims that Shelby Construction was a new business with only six, full-time employees, but

17

there is no evidence defendant did anything to encourage Brian to misrepresent the facts in an effort to obtain workers' compensation insurance from CCN.

In short, the prosecution relied on direct and circumstantial evidence to prove defendant aided and abetted Brian in the commission of workers' compensation fraud. The trial court correctly instructed the jury with CALCRIM No. 223, which explains the difference between direct and circumstantial evidence, and CALCRIM No. 225, which states in relevant part, "[B]efore you may rely on circumstantial evidence to conclude that the defendant had the required intent and/or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and/or mental state." The jury heard all the evidence and concluded the circumstantial evidence proved defendant's guilt. Substantial evidence supports the jury's conclusion with respect to counts 1 and 3, but not on count 2. Count 2 is therefore reversed, and the judgment modified accordingly.

*b. Count 4*

Unemployment Insurance Code section 2118.5 provides, in pertinent part, "Any person required by this code to collect, account for, and pay over any tax or amount required to be withheld who willfully fails to collect or truthfully account for and pay over the tax or amount shall, in addition to other penalties provided by law, be guilty of a felony . . . ."

Again, the evidence established defendant's active involvement and control over personnel matters. He signed and distributed employee paychecks, and when employee paychecks started to bounce, defendant was the one making alternative arrangements to ensure the employees got paid. Under these facts, the jury reasonably inferred defendant had knowledge the Shelby Companies were not meeting their financial obligations, including the collection and transmission of employee withholding taxes.

In sum, while the prosecution did not prove defendant filled out workers' compensation applications, or prepared the periodic reports required by the workers'

18

compensation insurance providers involved here, defendant claimed to be and acted like a co-owner of the Shelby Companies. Did he know everything Brian knew? Probably not. But circumstantial evidence demonstrates defendant knew the Shelby Companies were not accurately reporting the number of employees to the Secretary of State, or to their various workers' compensation insurance carriers. Moreover, it is clear defendant was aware of the companies' financial condition and took steps to manage cash flow by not collecting and transmitting employee withholding, or paying workers' compensation insurance premiums. Therefore, substantial evidence supports the verdict on count 4.

*c. Count 6: Perjury*

Count 6 charged defendant with perjury. The prosecution presented evidence that defendant had a contractor's license in the 1990's, but that it was revoked in 1993 after defendant and two of his clients got into a dispute over money paid and work performed. As noted above.

Defendant applied for a new contractor's license in February 2008. Question No. 12 of the application stated, "'To the best of your knowledge, has anyone on this application or any company the person was a part of, or any immediate family member of the applicant ever received a citation from the [CSLB] or had a contractor's license or other professional or vocational license denied, suspended or revoked by this state or elsewhere. Check no if the license was suspended due to lack of bond, workers' compensation qualifier or family support. If checked yes, you are required to attach a statement detailing the events to this action.'"

Defendant checked the "no" box for question No. 12, under penalty of perjury. However, on the face page of the application, appellant wrote three, six-digit numbers in response to question No. 5b, which asked for "QUALIFYER'S EXISTING/PREVIOUS CSLB LICENSE NUMBER(S)."

Defendant claims his act of listing the numbers of the revoked licenses in Question No. 5b proves he mistakenly believed that his prior contractor's license had not

19

been revoked, which would then correct the false statement he made in question No. 12. The jury rejected his argument, and substantial evidence supports its conclusion.

"The elements of perjury are a willful statement, made under oath, of any material matter which the declarant knows to be false." (*People v. Trotter* (1999) 71 Cal.App.4th 436, 439.)[5] The court instructed the jury with CALCRIM No. 2640, which states, "To prove that the defendant is guilty of [perjury as charged in count 6], the People must prove that: [¶] 1. The defendant declared under penalty of perjury under circumstances in which such declaration was permitted by law; [¶] 2. When the defendant declared, he willfully stated that the information was true even though he knew it was false; [¶] 3. The information was material; [¶] 4. The defendant knew he was making the statement under penalty of perjury; [¶] [AND] [¶] 5. When the defendant made the false statement, he intended to certify falsely while under penalty of perjury; [¶] [AND] [¶] 6. The defendant signed and delivered his declaration to someone else intending that it be circulated or published as true."

Defendant's argument focuses on the second element. He claims, "By providing the number of the revoked license to the very agency that had revoked it, [defendant] in effect told that agency that it had at one time revoked his license." According to defendant, providing the number of the revoked license negates any intent to willfully misrepresent the status of that prior license. While that is one way to view the facts, the jury rejected this interpretation.

Defendant answered "no" to question No. 12, which he knew was a false statement because, as he admits, he provided three numbers, one of which matched his prior contractor's license number. Although defendant contends his act of providing the

---

5 Section 118, subdivision (a) states: "Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false . . . is guilty of perjury."

20

number of his revoked license negates his intent, we note the jury was also instructed that "If the defendant attempted to correct the statement after it was made, that attempt may show that the defendant did not intend to falsely [*sic*]. It is up to you to decide the meaning and importance of that conduct."

Here, the jury decided defendant's act of providing the revoked contractor's license number in an entirely different part of the form did not demonstrate that defendant made an innocent mistake when answering question No. 12. This is a reasonable interpretation of the facts, one supported by substantial evidence.

Defendant also points to a document entitled, "'Addendum to Question No. 12,'" (addendum) which states, "'My company suffered from financial problems, and I was forced to close the door and file for bankruptcy. It is my belief and understanding that the bankruptcy discharged the CSLB issue." Defendant argues the addendum document creates per se reasonable doubt as to his intent. But the addendum was not included with the application, and there is no evidence when or if this information was transmitted to CSLB.

In short, the jury was properly instructed on the crime of perjury and aware of the facts relied on by the prosecution. The jury rejected defendant's defense to the charge. An appellate court does not reweigh the evidence, quibble with the jury's credibility determinations, or reverse convictions based on its own view of the evidence when, as here, substantial evidence supports the jury's verdict.

*2. Jury Instructions*

With respect to count 4, defendant claims, "Since section 2118.5 is a tax statute that was not intended to create strict liability, the jury should have been instructed that the prosecution was required to prove that [defendant's] failure to pay money to EDD was a 'voluntary, intentional violation of a known duty.'" We conclude the instructions given by the trial court were adequate.

21

When reviewing challenged jury instructions, we begin with the principle that "the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener,* (1986) 41 Cal.3d 505, 538-539, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754.)  "We assume that the jurors are ""'intelligent persons and capable of understanding *and correlating* all jury instructions . . . given.'"" [Citation.]"  (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.)  When a criminal defendant alleges instructional error, our review is de novo.  (See *People v. Burgener*, *supra*, at pp. 538-540, disapproved on other grounds in *People v. Reyes*, *supra*, at p. 754; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-280.)

The trial court instructed the jury as follows:  "The defendant is charged in Count 4 with failure to withhold or pay over tax withheld in violation of Unemployment Insurance Code Section 2118.5.  To prove that the defendant is guilty of this crime, the People must prove:  [¶] One, the defendant is an employer with at least one employee who is required to collect, account for and pay over any tax or amount required to be withheld.  [¶] Two, the defendant willfully failed to collect or truthfully account for and pay over the tax or amount required."

Pointing to the word "willfully," defendant insists "the instruction for Count Four required the jury to apply the term 'willfully,' but provided no definition for that term."  We are not persuaded the failure to define "willfully" as it appears in this instruction constitutes reversible error.

First, defendant made no attempt to clarify the instruction.  "'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]"  (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)

Second, the trial court gave CALCRIM No. 252.  This instruction told the jury, "The crimes charged in Counts 1, 2, 3, 4, 5 and 6 requires proof of the union or joint

22

operation, of act and wrongful intent.  [¶] . . . [¶] The following crimes require specific intent or mental state:  Misrepresentation, as Charged in Count 1, Misrepresentation, as charged in Count 2, Misrepresentation, as charged in Count 3, Failure to pay tax, as charged in Count 4 and Money Laundering, as charged in Count 5.  For you to find a person guilty of these crimes or to find the allegations true, that person must not only intentionally commit the prohibited act or intentionally fail to do the required act, but must do so with a specific intent and/or mental state.  The act and the specific intent and/or mental state required are explained in the instruction for that crime or allegation."  This instruction clarified the required mental state.  Nothing more was required.

Third, the court also gave CALCRIM No. 200, which said, "Some words or phrases used during this trial have legal meanings that are different from their meaning in everyday use.  These words and phrases will be specifically defined in these instructions.  Please be sure to listen carefully and follow the definitions that I give you.  Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."  (See also *People v. Bland* (2002) 28 Cal.4th 313, 343.)

The word "willful" is a common term that is used in everyday conversation.  The trial court was not required to give a clarifying instruction on how to use this word in the context of the unemployment tax fraud charge.  When viewed as a whole, the jury instructions adequately explained the mental state required for this crime.

*3. True Finding on Enhancement*

Our resolution of defendant's sufficiency of the evidence claims also partially resolves his challenge to the section 186.11, subdivision (a)(2) enhancement.  Section 186.11, subdivision (a)(1) states, "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single

23

criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3)."

The evidence demonstrates defendant committed two or more felonies involving fraud that established a pattern of related felony conduct in the taking of over $500,000. However, as defendant points out, the trial court failed to give CALCRIM No. 3221, the enhancement's pattern instruction. The Attorney General concedes this was error, but argues the pattern instruction closely mirrors the statutory language. We agree. Generally, "the language of a statute defining a crime or defense" may serve as the instruction. (*People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547.) Here, in order to find the enhancement true, the jury necessarily found sufficient evidence of all the statutory elements.

Defendant also complains that the jury was not given a definition of the phrase "'pattern of related felony conduct.'" However, the concept of repeated, related felony conduct needed no further definition in this case. (*People v. Frederick* (2006) 142 Cal.App.4th 400, 420 ["the phrases 'pattern of related felony conduct' and 'related felonies' have no peculiar technical meaning, and are phrases commonly understood without further definition"].) The court's error in failing to give the pattern instruction for the major fraud enhancement was harmless beyond a reasonable doubt.

## DISPOSITION

The conviction on count 2 is reversed for insufficiency of the evidence. We direct the clerk of the Riverside County superior court to modify the abstract of judgment and forward a copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.

25