[No. A069374. First Dist., Div. Four. Feb. 28, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMMY LEE BROWN, Defendant and Appellant.

## COUNSEL

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Catherine A. Rivlin, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**ANDERSON, P. J.**—By amended information, the Alameda District Attorney accused defendant Tommy Lee Brown (appellant) of 2 counts of lewd

and lascivious conduct on a child 14 or 15 years old, where defendant is at least 10 years older (Pen. Code,[1] § 288, former subd. (c)) and 2 counts of penetration by a foreign object (§ 289, subd. former (a)). The jury convicted appellant of all four counts. The court sentenced him to two consecutive, three-year terms for the penetration convictions and stayed the lewd act convictions, for a total sentence of six years.

On appeal appellant maintains the court erred in failing to deliver unanimity instructions. He further contends the court erred in instructing in accordance with CALJIC No. 2.21.2. We find no prejudicial error and affirm.

## I. FACTS

In 1993 appellant and his wife of six and one-half years, lived in Oakland, along with Latina and Daniel, the wife's two children from a previous marriage. Appellant was 49 at the time; Latina was 15 and Daniel was a few years younger. Appellant "went on disability" in April 1992. He was "on disability" because of stress, arthritis and "major depression." Consequently, he was home every day.

Latina testified at trial that during the summer she noticed that appellant began staring at her "a lot," "like boys do at school." When he stared at her, he would lick his lips. One morning in September when Latina came into the bedroom to kiss him good-bye he "show[ed] himself" by pulling the covers down.

Then, one day in October Latina stayed home from school because she was sick. That morning appellant woke her to give her cold medication. He also offered her massages. Latina did not want a massage, but he massaged her anyway. That afternoon appellant insisted that she watch television with him in the living room. She was on the couch, appellant was on the recliner. Appellant offered her massages again, but again she did not want them. He got up and massaged her anyway, starting with her shoulders and back. Then he touched her chest area and started squeezing her breasts, at first on top of her clothes and then underneath. Meanwhile, he was pushing her down. Latina tried to push his hands off. He also put his mouth on her nipple and tried to put his mouth on hers. Then he put his hands down her pants and stuck his fingers in her vagina. Again, Latina tried to push him off. While appellant molested Latina, he was smiling and licking his lips.

Appellant stopped when Daniel came in through the back door. A few minutes later appellant came into Latina's room and lay down on the floor.

---

[1] All statutory references are to the Penal Code.

He was apologetic about what happened, indicating he was under stress and did not mean to impose his stress on her.

A few days later Latina was again home sick with a cold and flu. Appellant came in her bedroom and gave her medication and rubbed "Vick's" on her chest and back. Latina said she could do it herself, but he insisted on applying the salve. Appellant did not touch her inappropriately at that time.

Again, appellant asked Latina to watch television with him. She did for awhile and then went to wash dishes. Appellant came in and started massaging her back. When he started moving his hands closer to her breast area, she pushed them off. Appellant kept massaging her shoulders and back and started bumping against her buttocks with his penis. She tried to push him away; eventually he stopped.

After Latina finished the dishes she went into the living room and sat on the floor. Appellant sat beside her and started massaging her back. Latina said she did not want him to massage her back. He kept smiling. Appellant started touching and squeezing her breasts, on top of the clothes and then underneath. Again, he kissed her nipple area and penetrated her vagina with his fingers.

When initially testifying for the prosecution Latina said she then succeeded in pushing him off, ran to the bathroom but he chased her and held the door. At first she said she did not remember what happened after that. But upon further questioning Latina related that when she returned to the living room appellant touched and mouthed her breast again, and again digitally penetrated her vagina. This was the first time Latina had told anyone about this last incident. On cross-examination, Latina retracted the third incident. Then on redirect Latina said that before she ran to the bathroom, appellant squeezed her breasts and asked her if he could "put a part of himself in me." Latina said, "No." She ran to the bathroom but appellant pulled her back and continued fondling her breasts and again inserted his fingers into her vagina. Finally, on recross Latina admitted she lied on cross-examination. She said she lied because she was embarrassed and did not want to tell that appellant had asked to put himself inside her.

Latina did not tell her mother right away about these incidents because she thought her mother was happy with appellant. Latina did not want to be the cause of the couple's breakup. Instead, she tried to stay close to her brother and mother. Then, after overhearing her mother tell a friend how unhappy she was with appellant, Latina decided to write her mother a letter. Her

mother found the letter in her purse on January 7th. In the letter Latina told her mother that appellant had molested her, she did not like it and did not want to live with appellant anymore.

Latina's mother discussed the situation with her and reported the incidents to the police a few days later.

On January 11, 1995, Dr. Bethke examined Latina. The examination did not reveal one way or another whether she had been sexually molested.[2] Latina did reveal to Dr. Bethke that she experienced pain with urination for two to three days after the molestations. This is consistent with having some kind of abrasion.

### Defense

Appellant took the stand and denied all allegations. Appellant told a police investigator that Latina was "doing this to get at me." He also commented to the investigator he had told Latina she had to do more chores, that she had told him "she doesn't like me" and "she doesn't want to be there."

Appellant's two natural daughters each testified that they left home as teenagers because appellant was very strict. They also stated that appellant had never touched them in a sexually inappropriate way.

Appellant testified that he had been experiencing pain in his hands, wrist, toes and knees for several years. He wore wrist braces for his arthritis and had been on disability since April 1992 because of the arthritis and "major depression."

His primary care physician indicated that in 1993 appellant complained of pain in his feet and wrists. In October 1993 he was taking medication for high-blood pressure, the antidepressant Prozac, and an antiinflammatory. Decreased libido is one side effect of Prozac. Increased sex drive is a less common side effect.

Dr. Nancy Vancouvering, a clinical psychologist, reviewed psychological records and reports pertaining to appellant, as well as the pertinent police reports. The doctors preparing these various reports were unanimous in their conclusion that appellant was "a rather depressed, withdrawn, permanently unhappy, doesn't get along with other people, kind of guy." They described,

[2]Carmenza Salgado, an expert in child sexual abuse, concurred that the findings from Dr. Bethke's examination were consistent both with digital penetration and with "not being touched at all."

in varying degrees, someone who was "long-time suspicious." With depression, "sex drive classically is diminished." Dr. Vancouvering stated she would not "pick" someone such as appellant with a diagnosis of depression and paranoia "to be a child molester."[3]

## II. DISCUSSION

### A. *Appellant Was Not Prejudiced by Failure to Deliver a Unanimity Instruction*

The information charged, and the jury found, that appellant committed two acts of lewd conduct upon a child. Appellant maintains that Latina testified to four distinct lewd acts[4] over the two days in question and, thus, the court on its own should have delivered a unanimity instruction. Failure to deliver a unanimity instruction,[5] he claims, was reversible error. We do not agree.

When a defendant is charged with a single criminal act but the evidence reveals more than one such act, the prosecution must either select the particular act upon which it relies to prove the charge or the jury must be instructed that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. (*People* v. *Winkle* (1988) 206 Cal.App.3d 822, 826 [253 Cal.Rptr. 726]; *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174].) The unanimity requirement is constitutionally rooted in the principle that a criminal defendant

---

[3] In rebuttal, psychologist Jeffrey Bodmer-Turner, a licensed marriage, child and family counselor with an expertise in the area of child molestation and the behavior of child molesters, testified that individuals with depression may be molesters. In his opinion, depression "in and of itself, is not sufficient exclusion criteria for any specific type of behavior including deviant sexual behavior, including child molestation." Dr. Bodmer-Turner stated that a two-month delay between the experience of being molested and disclosure of the incident is not uncommon, and that children might delay disclosure for fear of the consequences of disclosure, including fear of disrupting the family.

[4] Appellant identifies the following four molestations, one on the first day and three on the second: (1) on the first day, while in the living room; (2) on the second day, (a) while washing dishes in the kitchen; (b) while in the living room before running to the bathroom; and (c) while in the living room after having run to the bathroom.

[5] Appellant mentions both CALJIC No. 4.71.5 (1990 rev.) (5th ed. pocket pt.) and CALJIC No. 17.01 (5th ed. 1988 bound vol.).

CALJIC No. 4.71.5 now reads in part: "And, in order to find the defendant guilty, you must unanimously agree upon the commission of [the same specific act [or acts] constituting the crime] . . . within the period alleged."

CALJIC No. 17.01 reads in part: "The prosecution has introduced evidence tending to prove that there is more than one [act] . . . upon which a conviction [on Count __] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts]. . . . However, in order to return a verdict of guilty [to Count __], all jurors must agree that [he] [she] committed the same [act] . . . [or] [acts] . . . ."

is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged. (*People* v. *Jones* (1990) 51 Cal.3d 294, 305, 321 [270 Cal.Rptr. 611, 792 P.2d 643]; see Cal. Const., art. I, § 16.)

Thus, in cases in which the evidence indicates the jurors might disagree as to the particular act that the defendant committed, the court should deliver the standard unanimity instruction. (*People* v. *Jones*, *supra*, 51 Cal.3d at p. 321.) However, in ruling that refusal to give a unanimity instruction was prejudicial error where two separate counts of bribery were proven under the umbrella of a single count, our Supreme Court went on to state that "[t]his is not a case where the jury's verdict implies that it did not believe the only defense offered." (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 282-283 [182 Cal.Rptr. 354, 643 P.2d 971].)

Seizing on this language, some courts have carved out an exception to the sua sponte obligation to instruct on unanimity. In *People* v. *Gonzalez* the court explained: "A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged. This danger, however, does not automatically arise in every case where a confused and distraught victim happens to recall additional instances of the sex crime charged. Rather, the possibility of disagreement exists where the defendant is accused of a number of unrelated incidents, such as alleged rapes at different times or places, leaving the jurors free to believe different parts of the testimony and yet convict the defendant. . . . Disagreement may also exist where the defendant offers a defense which could be accepted or rejected as to some but not all of the acts." (*People* v. *Gonzalez* (1983) 141 Cal.App.3d 786, 791-792 [190 Cal.Rptr. 554], disapproved on other grounds in *People* v. *Kurtzman* (1988) 46 Cal.3d 322, 330 [250 Cal.Rptr. 244, 758 P.2d 572].)

In the same vein, the reviewing court in *People* v. *Schultz* (1987) 192 Cal.App.3d 535, 539-540 [237 Cal.Rptr. 513] concluded that a unanimity instruction is unnecessary, and failure to instruct is not error, noting that "[i]n order for the unanimity instruction to be significant, there must be evidence from which reasonable jurors could *both* accept *and* reject the occurrence of at least the same number of acts as there are charged crimes." (See also *People* v. *Meyer* (1988) 197 Cal.App.3d 1307, 1311-1312 [243 Cal.Rptr. 533], original italics.)

Under similar circumstances other courts have treated failure to give unanimity instructions as harmless error. (*People* v. *Deletto* (1983) 147 Cal.App.3d 458, 464-474 [195 Cal.Rptr. 233]; see also *People* v. *Kaurish* (1990) 52 Cal.3d 648, 694-695 [276 Cal.Rptr. 788, 802 P.2d 278].)

Because of the changes in Latina's testimony concerning the lewd incidents occurring on the second day, as well as the fact that she revealed the third incident for the first time at trial, we conclude it was error to omit a unanimity instruction.[6] The question is whether that error was harmless. We conclude it was.

First, the two molestations were consistently described as occurring on two separate occasions, on two separate days. Thus, since the jury rejected appellant's only defense, there could be no disagreement that the molestation occurring on the first day constituted one of the section 288, former subdivision (c), counts. Second, the kitchen bumping incident was never a contender for the second molestation count. The prosecutor defined the two lewd incidents as feeling Latina's breasts and, thus, elected not to pursue the bumping episode as the charged crime.

This leaves us with two potential second day incidents. To review: on direct examination Latina testified to both fondling and penetration while on the living room floor; she then escaped briefly to the bathroom, to be pulled back by appellant to the living room, where a second fondling and penetration occurred. She denied the second set of incidents on cross-examination. On redirect she alluded to breast fondling but not penetration while initially in the living room, the aborted escape to the bathroom, and fondling and penetration back in the living room.

From this it is apparent that Latina consistently said appellant fondled her breasts before she ran to the bathroom. Given that the jury rejected appellant's only defense, there would be no reason for juror disagreement that this

---

[6]The People argue vigorously that no unanimity instruction was needed on the theory that the second day molestations were a continuing course of conduct. Notwithstanding *People* v. *McIntyre* (1981) 115 Cal.App.3d 899, 910 [176 Cal.Rptr. 3] (two separate instances of forced oral copulation occurring before and after rape; the fact that second forced oral copulation occurred within minutes during the sexual attack "does not necessarily make this another separate crime . . .") we do not accept the continuing course of conduct argument. First, this approach is belied by the People's action at trial in attempting to amend the complaint to add an *additional* section 288, former subdivision (c), count. Second, the crime described in section 288, former subdivision (c), is not a continuous course of conduct crime as is the crime of continuous sexual abuse of a child described in section 288.5. Rather, section 288, former subdivision (c), criminalizes specific lewd or lascivious *acts*. Third, offenses such as those at issue are not only separate, but are separately punishable crimes. (*People* v. *Goldstein* (1982) 130 Cal.App.3d 1024, 1040 [182 Cal.Rptr. 207].) The continuing course of conduct exception applies when the acts are so closely connected that they form one and the same transaction *and, thus, the same offense.* (*People* v. *Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516].) Here, Latina testified to two separate molestations on the second day, broken in time by the intervening act of running to the bathroom and then being dragged back to the living room.

fondling occurred. Moreover, this act made sense and was consistent with her escaping to the bathroom. There would be no reason to run away if appellant were not molesting her. Finally, there would be no reason to reject her testimony concerning the second fondling, to which she consistently testified on direct and redirect. That the jury would unanimously agree that two fondlings occurred does not render the error prejudicial. The important question is whether there was anything in the record by way of evidence or argument to support discriminating between the two incidents such that the jury could find that appellant committed one molestation but not the other. (*People* v. *Deletto, supra,* 147 Cal.App.3d at pp. 466-467.) There was not. To state it slightly differently, in order for the unanimity instruction to make a difference, there must be evidence from which jurors could *both accept and reject* the occurrence of at least the same number of acts as there are charged crimes. (*People* v. *Schultz, supra,* 192 Cal.App.3d at p. 540.) There was not. Failure to deliver a unanimity instruction was harmless beyond a reasonable doubt.

## B. *The Court Did Not Err in Delivering CALJIC No. 2.21.2*

 Appellant also maintains that the court erred in instructing the jury in the language of CALJIC No. 2.21.2 (5th ed. 1988 bound vol.), to the effect: "A witness who is willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless from all the evidence you believe the probability of truth favors his or her testimony in other particulars."

Appellant argues this instruction potentially lowers the standard of proof for conviction by permitting the jury to assess the testimony of prosecution witnesses under a "probability of truth" standard. When, as in this case, the matter boils down to a credibility contest, he urges reversal for prejudicial error.

Our Supreme Court has rejected an attack on CALJIC No. 2.21.2 when the contention is that as applied to defendant's testimony, it erroneously ratchets up the burden of proof from raising a reasonable doubt to meeting a "probability of truth" standard. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 93-95 [279 Cal.Rptr. 276, 806 P.2d 1311].) The court explained: "The instruction at no point *requires* the jury to reject any testimony; it simply states circumstances under which it *may* do so. [Citation.] The qualification attacked by defendant as shifting the burden of proof . . . is merely a statement of the obvious—that the jury should refrain from rejecting the

whole of a witness's testimony if it believes that the probability of truth favors any part of it. [¶] 'Thus CALJIC No. 2.21[.2] does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute.' " (*Id.*, at p. 95, original italics.)

Several recent cases have discussed CALJIC No. 2.21.2 in the context of evaluating a prosecution witness. Appellant relies on the first, *People v. Rivers* (1993) 20 Cal.App.4th 1040 [25 Cal.Rptr.2d 602]. The *Rivers* court opined that an instruction which told the jury it could accept the testimony of the prosecution's sole percipient witness based on a probability standard was "somewhat suspect." (*Id.*, at p. 1046.) However, it also noted that the correctness of jury instructions is determined from the entire charge. The *Rivers* jury properly received CALJIC No. 2.90 on reasonable doubt, including the mandate to decide the case based on " 'the entire comparison and consideration of all the evidence' " and further was directed per CALJIC No. 1.01 to " 'consider the instructions as a whole and in light of all the others.' " (20 Cal.App.4th at p. 1046, citing *People v. Salas* (1975) 51 Cal.App.3d 151 [123 Cal.Rptr. 903].) For this and other reasons, the *Rivers* court rejected the defendant's challenge to CALJIC No. 2.21.2.

Taking up this point, the court in *People v. Foster* (1995) 34 Cal.App.4th 766 [40 Cal.Rptr.2d 633] noted that the jury also received CALJIC Nos. 1.01 and 2.90, ruling that "regardless of what concerns might arise if CALJIC No. 2.21.2 had stood alone, or what appropriate limitations or clarifications might have been added to its language, when the instructions are considered as a whole we are satisfied the jury was adequately told to apply CALJIC No. 2.21.2 'only as part of the process of determining whether the prosecution had met its fundamental burden of proving [defendant's] guilt beyond a reasonable doubt.' [Citation.]" (34 Cal.App.4th at p. 775.)

Finally, in *People v. Wade* (1995) 39 Cal.App.4th 1487, 1495 [46 Cal.Rptr.2d 645] the reviewing court likewise concluded it was not error to deliver CALJIC No. 2.21.2 "despite its application to prosecution witnesses, because the jury was fully instructed on the burden of proof and was told to consider the instructions as a whole." As in *Rivers*, *Foster* and *Wade*, the court here gave CALJIC Nos. 1.01 and 2.90 such that, evaluating the entire charge to the jury, there was no error in delivering CALJIC No. 2.21.2 notwithstanding its application to Latina's testimony.

The judgment is affirmed.

Poché, J., and Hanlon, J., concurred.