Filed 2/18/15  P. v. Maddox CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL MADDOX,<br><br>Defendant and Appellant. | B251824<br><br>(Los Angeles County<br>Super. Ct. No. NA090569) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Affirmed in part and reversed in part.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

# INTRODUCTION

Defendant Michael Maddox was convicted by a jury on count 1 of oral copulation and on count 2 of sexual penetration of five-year old J. T., in violation of Penal Code section 288.7, subdivision (b).[1] The trial court sentenced Maddox on each count to consecutive terms of 15 years to life, for an aggregate term of 30 years to life. On appeal, he challenges his conviction on count 2.

We find it was error for the court not to give a unanimity instruction as to count 2 for sexual penetration in light of evidence of two separate criminal acts that the jury could have found constituted sexual penetration. While the prosecutor argued that Maddox committed sexual penetration by use of his finger, she also discussed evidence of Maddox's saliva in J.'s vaginal area and, after deliberating for three hours, the jury inquired whether the tongue was a "penetrative device" for purpose of sexual penetration, which the court answered in the affirmative. In light of conflicting evidence as to whether the sexual penetration was caused by Maddox touching J.'s vaginal area with his finger or "licking" the vaginal area with his tongue, some jurors may have believed Maddox committed sexual penetration by his finger and others by a separate act using his tongue, depriving Maddox of a unanimous verdict as to count 2.

We find the instructional error is not harmless under *Chapman v. California* (1967) 386 U.S. 18, 23, and reverse as to count 2. We affirm as to count one, which is not challenged on appeal.[2]

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Because we find the court was required to give a unanimity instruction and reverse count 2 on that basis, we need not reach Maddox's other contentions on appeal. Maddox argues in the alternative that the court improperly instructed the jury on count 2 as to general intent even though the crime of sexual penetration requires proof of a specific intent. Maddox also argues that to the extent the jury believed that Maddox committed sexual penetration by use of his tongue, the court should have stayed the punishment on count 2 under section 654 or, in the alternative, the court should find the sentence on count 2 violates Maddox's Fifth Amendment protection against double punishment.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## A. *Procedural Background*

The People charged Maddox in an amended information with two counts of oral copulation/sexual penetration of a child under 10 committed on or about March 10, 2010. (§ 288.7, subd. (b).)  The first jury trial commenced on February 27, 2013.  The jury was unable to reach a verdict on either count, and the court declared a mistrial.  The second jury trial commenced on August 15, 2013.  The jury reached a verdict on August 22, 2013, finding Maddox guilty of one count of oral copulation and one count of sexual penetration.

## B. *Trial Court Proceedings*

### 1. The Prosecution Evidence

The prosecution presented its case through the testimony of J., her mother W. H., her godmother J.H., two investigative officers, and a SART nurse,[3] in addition to DNA evidence.

### a. *Events Leading up to the Incident*

On March 10, 2010, W.H. asked J.H. to watch J. because J. had pinkeye and could not go to school.  At the time, J. was five-and-a-half years old.  J.H. was married to Maddox, and both are J.'s godparents.  J.H. often watched J. and her older brother Billy when their mother W.H. was at work.  W.H. testified that J. had a good relationship with J.H. and Maddox.

On the way to J.H.'s home, W.H. was involved in a traffic accident in which she rear-ended another car.  J. was sitting in the back in a booster seat with a lap belt.  J. said

---

[3]     SART refers to the Sexual Assault Response Team that responds to cases of sexual abuse.  In this case the SART team included the two detectives who interviewed J. and a nurse who performed a forensic examination at the hospital.

she hit her chin but did not complain of any other pain. Paramedics examined J. but, according to W.H., "she was fine." W.H. testified that J. did not hit her genital area.

W.H. then dropped J. off at J.H.'s home at approximately 10:00 or 10:30 a.m. Shortly thereafter, J.H. left to go grocery shopping, and left J. alone with Maddox. According to J.H., this was the only time that she left J. alone with Maddox.[4]

### b. *J.'s Testimony*

J. testified that she had pinkeye and went to "Uncle Michael and Auntie Jackie."[5] She was alone with Maddox while J.H. went to the grocery store. She watched cartoons on television in the living room. J. went to the bathroom by herself, then returned to the living room and continued to watch television. At some point J. went to the bedroom to ask Maddox for a bandage "because I think I had an owey on my knee." She testified that she bumped her leg in the car accident.

J. testified that after Maddox gave her a bandage, he pulled down her pants and panties. J. described the incident by testifying that Maddox "licked my private" and "touched it . . . [with his] fingers." The incident happened while she was on the bed in the bedroom. J. did not testify specifically that Maddox put his finger or tongue inside her vagina.

J. testified:[6]

"Q: Then . . . tell us about when he licked your privates, how many times—

"A: One time.

"Q: What did he lick it with?

---

[4]     At trial, J.H. was impeached with her preliminary hearing testimony in which, when asked if this was the first time she left J. alone with Maddox, she answered "no."

[5]     J. was eight years old when she testified at trial.

[6]     Jaylin's testimony is quoted here at length given the central question of whether Maddox placed his fingers or tongue inside her vagina, described by her as where she goes "pee pee."

4

"A:  His tongue.  [¶]  . . .  [¶]

"Q:  When you say privates, do you mean where you go pee pee or poo-poo?

"A:  Pee pee.

"Q:  Okay.  That's what you mean by where he licked you?

"A:  Yes."

J. testified further:

"Q:  . . . What did he do with his finger?

"A:  I don't know.

"Q:  Well, do you remember where—did he put it somewhere?

"A:  I think so.

"Q:  Okay.  Where do you think he put it?

"A:  On top.

"Q:  On top of what?

"A:  My private.

"Q:  Now, on your skin, touching your skin or touching something else?

"A:  I think my skin.

"Q:  Now, when you say privates again, are you talking about where you go pee pee or somewhere else?

"A:  Pee pee.

"Q:  Did he just—did he just touch it like you see me doing something like that (indicating), or what did he do?

"A:  Like what you did.

"Q:  Did he touch—

"[Defense counsel]:  Can I just for the record say it looks like a tap.

"The Court:  Yes."

When asked later, "Did he touch just on the outside or on the inside," J. responded, "I think just the outside."  On cross examination, J. was again asked whether Maddox "rubbed it like tapped it, like I'm tapping my hand like that (indicating)," and

5

she responded, "I think so."  When asked, "On that day did you ever see uncle Michael's pee pee," J. answered, "No—I think so.  I don't remember."

J. testified that Maddox said to her:  "Don't tell anybody."  When Maddox stopped touching her, she pulled up her pants.  J. then walked out of the room and returned to the couch to watch cartoons.  When asked whether the incident was quick or lasted a long time, she responded, "I think it went quick."  This was the first time Maddox had touched her.

### c.  *Events Following the Incident*

W.H. testified that she returned to J.H.'s home between 12:00 p.m. and 12:30 p.m. to pickup J.  J.H. was not home.  When she arrived, Maddox was "goofing around with J. and stuff, making her laugh and stuff . . . ."  W.H. testified that "J. was, you know, her normal self."

W.H. then drove with J. to the elementary school for a parent-teacher conference.  During the ride, J. was "unusually quiet," had her head down, and was crying, but when W.H. asked her, "[w]hat's wrong," J. responded, "[n]othing wrong."  J. played with her brother Billy during the parent-teacher conference.  W.H. then told J. and Billy to use the restroom because their drive home would take 15 to 20 minutes.  J. went into the bathroom stall by herself while her mother waited outside.  J. said she couldn't "pee." When W.H. asked, "Why can't you pee?"  J. responded, "because it hurts."  W.H. asked her why it hurt, and J. answered, "Uncle licked my pee pee."  When W.H. asked her about what she just said, J. repeated, "Uncle Mike licked my pee pee."  W.H. also testified that J. said, "[i]t hurts and burns because she couldn't pee."  W.H. called J.H. and told her what happened, called J.'s father, then took J. to the hospital.

### d.  *Interviews and Examination at the Hospital*

At the hospital, Long Beach Police Department Child Abuse Detective Araceli Thue interviewed W.H. and J. about the incident.  Thue first interviewed W.H. without J.

present to determine what J. told her about the incident.  Then Thue interviewed J. with W.H. and SART nurse Toyetta Beukes present.

J. told Thue that Maddox touched her "pee pee" with his hand and his tongue. Thue testified that J. was acting upset and distraught, and was withdrawn during the interview.  Thue opined that it was common for a child of sexual assault to be withdrawn and exhibit these types of emotions.  At trial, Thue identified J. in a photograph admitted into evidence, in which J. is smiling.  Both Thue and Beukes testified that the photograph was taken after the alleged assault and prior to the SART exam.  Beukes testified that J. was smiling for the camera but that she was not smiling during the interview.

After Thue's interview, Beukes performed a SART exam on J., with W.H. present. Beukes interviewed J. about what happened while collecting swabs from various parts of her body, including her mouth, thighs, genitalia and anal area.  Beukes testified as to what J. told her, referring to her report:  "'He picked me up and laid me on the bed.' . . . 'Then he called Jackie and she said she would come in five minutes.' . . .  He licked my pee pee, he put his wee wee on my privates.  He touched it with his hands.'"  Beukes clarified that when J. said, "He touched it with his hands," she was referring to J.'s genitalia.  J. also said, "I didn't want him to touch me.  He touched my butt with his fingers.  He said, 'sorry.'"

Beukes testified that J. had a "laceration[,] abrasion and tenderness and redness" to her genital "fossa navicularis and posterior fourchette."  However her hymen appeared normal.  Beukes took two vestibule swabs.  She described the vestibule as "the inner part of the labia minora and it surrounds the hymen, the tissue."  She said that to get into the vestibule you have to get past the outer and inner lips.[7]  Beukes wrote in the report, "Patient has a genital tear with abrasion and redness.  Patient has redness to her vestibule.

---

[7]    Senior criminalist Cindy Carroll, who worked for the Los Angeles County Sheriff's Department crime lab, testified that the "vestibule" is "exterior to the vaginal opening more interior to the outer external genital area."  When asked whether it is the "inner part of the external area of the vagina roughly," she responded, "Yes.  Better way to describe it."

Patient has an anal tear, it's linear. All findings are consistent with history patient gave to examiner." W.H. similarly testified that when her daughter was on the gynecological table during the exam, W.H. saw "redness, puffiness and she had a slight tear."

Based on her examination of J. and interviews of J. and W.H., Beukes concluded in her written report that J. "had abnormal genital and anal findings. They were consistent with her history, nonspecific. It can be caused by sexual abuse or other mechanisms but the findings were concerning." She also checked the box, "need further consultation on investigation," meaning additional interviews, a forensic interview or DNA analysis. Beukes also stated that J.'s report of pain during urination was consistent with the genital tear to the fossa navicularis and posterior fourchette.

Maddox agreed to be interviewed, and Thue interviewed him at the police station. Maddox denied sexually assaulting J. He told Thue that he "spanked her on her butt because she was touching a picture frame." Thue collected a saliva sample from Maddox.

### e. *DNA Evidence*

Los Angeles County Sheriff's Department Senior Criminalist Richon Tate compared swabs taken from J. as part of the sexual assault evidence kit to an oral sample taken from Maddox. Four of J.'s samples tested positive for the possible presence of amylase, including samples from the left thigh, right thigh, vestibule and anal area. Tate testified that amylase can be found in saliva and fecal matter, and contains DNA that can be tested.

Tate compared the four samples from J. that tested positive for amylase to the reference sample from Maddox. Tests of J.'s swabs proved negative for the presence of semen. Tate tested the samples for DNA, and found that the DNA detected in the samples from J.'s right thigh, anal and vestibular swabs were too low to be detected in the kit he was using to test for DNA. He was able to test the DNA from the mouth and left thigh samples. After Tate performed his testing, he delivered the samples to Senior

Criminalist Carroll to process them for Y-STR testing,[8] which only looks at the Y chromosome unique to males. Carroll conducted Y-STR testing on the left thigh, mouth, and vestibule samples from J., in addition to the reference sample from Maddox.

### i. *Mouth Samples*

Tate testified that J.'s mouth samples showed a mixture of DNA from two contributors. The DNA of the major contributor matched J.'s DNA profile. However, there was not enough DNA to determine the other contributor. Carroll testified that she found a mixture of multiple people's DNA in J.'s mouth sample, including "at least three male donors." However, Maddox was excluded as a possible donor to this sample.

### ii. *Left Thigh Sample*

Tate testified that the left thigh sample was a mixture consistent with two contributors, and that the major contributor matched J.'s profile. He testified that Maddox was a possible minor contributor to the sample, and that it was one in 2,710 times more likely that the mixture was from J. and Maddox than from a random individual. Carroll opined that the left thigh sample was a mixture of DNA from at least two males and that the profile of the major male contributor matched Maddox's profile. Carroll testified that 99.9 percent of the African-American[9] male population would be excluded as a contributor, but others in Maddox's male blood line would not be excluded.[10]

---

[8]    Y-STR stands for Short Tandem Repeats and involves testing of the Y chromosome.

[9]    It is undisputed that Maddox is African-American.

[10]    J. testified that there were no other men at the home while she was alone with Maddox.

### iii. *Vestibule Sample*

As noted above, Tate found that the DNA in the sample from J.'s vestibule was too low to be used for his testing. However, Carroll conducted Y-STR testing on this sample. She obtained a partial profile from this sample that included Maddox as a possible contributor. Carroll testified that 99.7 percent of the African-American unrelated male population would be excluded from this sample.

## 2. The Defense Evidence

### a. *Officer Kroeger*

The defense called City of Long Beach Police Officer James Kroeger who testified that he was the first officer to respond to the hospital after the incident. Kroeger testified that W.H. told him that J. said Maddox asked her to go to the bathroom and that they were in the bathroom when "he pulled her pants down, touched her pee pee and then with his tongue and then licked her pee pee."[11] Kroeger's report did not state that the incident occurred in the bathroom. After Kroeger's interview, Thue took over the investigation.

### b. *Maddox's Testimony*

Maddox testified that he had been alone with J. while he babysat for her many times before March 10, 2010.[12] He was babysitting for J. at J.H.'s home on March 10. He and J.H. were having problems and were getting a divorce. He lived alone, and was at J.H.'s house on March 10.

When W.H. arrived, she told him about the car accident. W.H. then left for work. Later, J.H. left to go shopping. Maddox then put a movie on for J. to watch. At some point, J. attempted to pull the DVD out of the DVD player and it became stuck. Maddox

---

[11]    The transcript reflects that Kroeger testified J.H. made these statements, but it is clear from the context that he intended to refer to a conversation with Heard.

[12]    Maddox also testified that he had been convicted for being an "ex-con with a gun."

10

told J. she was not supposed to be touching the inside of the DVD player.  Maddox testified that J. "kind of knew I was upset," so she said, "Uncle this is your picture," and she grabbed the picture.  Maddox responded, "I asked you not to do that."  Maddox pulled the DVD out of the DVD player, then turned J. over, laid her down and "spanked her right there on the spot."  J. told him she was mad at him.

Maddox testified that when W.H. came to pick up J., Maddox told her that he had "whooped" J.  Maddox testified that J.H. later called him from the hospital and asked him about the incident, to which he responded, "Hurt her? . . . I whooped her."  When J.H. told Maddox they were at the hospital, he said, "[g]et her checked."  Maddox later called the detective and denied sexually touching J.  He offered to give the detective an oral swab.  On the stand, Maddox denied taking J. into the bedroom, laying her down, having her pull down her pants, or touching or licking her vaginal area.

### 3.  Jury Instructions

The court instructed the jury on counts 1 and 2 together using CALJIC No. 10.59.6 for the crime of "unlawful oral copulation/sexual penetration."  As part of this instruction, the court instructed the jury that, "'Oral copulation' is the act of copulating the mouth of one person with the sexual organ or anus of another person.  Any contact, however slight, between the mouth of one person and the sexual organ or anus of another person constitutes oral copulation.  Penetration of the mouth, sexual organ or anus is not required."  The court also instructed:  "'Sexual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

The jury verdicts more specifically described count 1 as "the crime of oral copulation with a child under 10" and count 2 as "the crime of sexual penetration with a child under 10."  The verdict form for count 2 did not specify the type of sexual penetration, i.e., by digital penetration.

11

### 4. Argument by Counsel

The prosecutor in her argument stated that the licking of J.'s vagina was the oral copulation charged in count 1. She argued that "count 2 is the penetration, the digital penetration." She said: "Again, by the finger. J. told you it was his finger. She said it was just a tap but you W.H. what she reported to the SART nurse and to everyone else that day, it was more like a rub." The prosecutor also relied in her argument on evidence of the vaginal tear, redness and anal tear as evidence of digital penetration. At the end of her argument, the prosecutor stated that Maddox "put her on the bed and put his amylase, saliva, in her vestibule."

Defense counsel argued that Maddox did not commit the alleged touching and licking of J.'s vagina. He attempted to minimize the DNA findings. He also argued that the tears could be from something other than sexual abuse. Finally, he noted that W.H. and other witnesses only testified as to what J. told them.

### 5. Jury Deliberations and Verdict

The jury began to deliberate on August 21, 2013 at 2:19 p.m. The jurors recessed at 4:00 p.m., and resumed their deliberations at 8:30 a.m. the next morning. At 9:45 a.m. on the second day (approximately three hours after they started deliberating), the jury sent a note that asked, "[i]s the tongue included as a penetrating device for Count 2, as well?" After talking with counsel, the court responded in writing: "As to count 2— please refer to page 41 of the instructions—second to last paragraph." The second to last paragraph refers to CALJIC No. 10.59.6, which defines "'foreign object, substance, instrument or *device*'" to "include any part of the human body, except a sexual organ." (Italics added.) Maddox argues that this response answered the question in the affirmative.

Approximately one hour and fifteen minutes after the court responded to the jury's note, at 11:00 a.m., the jury returned with its verdict. The jury found Maddox guilty on count 1 of oral copulation with a child under 10 and on count 2 of sexual penetration with a child under 10, both committed on or about March 10, 2010 against J. T.

12

## DISCUSSION

### A. *Standard of Review*

We review de novo the question whether a court commits error in instructing or failing to instruct the jury. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568; *People v. Quiroz* (2013) 215 Cal.App.4th 65, 73.)

### B. *A Conviction of Sexual Penetration Requires That the Jury Agree on the Criminal Act That Was Committed*

In a criminal case, the jury verdict must be unanimous. (Cal. Const., art. 1, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132; *People v. Collins* (1976) 17 Cal.3d 687, 692-693.) "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679 [but finding "continuous-course-of-conduct exception" to unanimity requirement where prosecutor argued alleged torture over a three-month period caused death];[13] accord,

---

[13] Where the continuous course of conduct exception applies, a unanimity instruction is not required. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679; see also *People v. Napoles* (2002) 104 Cal.App.4th 108, 116-117 [continuous course of conduct exception applied where information alleged that defendant committed child abuse between January and May 2000].) In this case, the People do not argue the continuous course of conduct exception. Moreover, the information alleged in count 2 is a single act of sexual penetration on or about March 10, 2010, and thus the exception would not apply. (See *People v. Brown* (1996) 42 Cal.App.4th 1493, 1501, fn. 6 [no continuous course of conduct exception for alleged section 288, subdivision (c), crime of lewd act because statute "criminalizes specific lewd or lascivious *acts*," and exception only applies "when the acts are so closely connected that they form one and the same transaction *and, thus,*

*Russo*, *supra*, at p. 1132.) The court has a sua sponte duty to give the unanimity instruction. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199; *People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 569; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

As our Supreme Court held in *Russo*, "'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]" (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.) The court in *Russo* specified two factors for a court to consider in deciding whether to give a unanimity instruction: "the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at p. 1135.) The court found a unanimity instruction was not required in the case before it because, while the jurors may have disagreed on which overt acts were committed, they must have agreed on which conspiracy the defendant committed. (*Ibid*.)

In this case, the People argue that no unanimity instruction was required for count 2 because (1) the People elected to proceed on a theory of digital penetration, and (2) the evidence was identical for penetration by the finger and the tongue so the jury must have unanimously found that both were proven. For the reasons set forth below, we disagree.

### 1. The People did not communicate their "election" of digital penetration

---

*the same offense*"].) Here an act by Maddox to digitally penetrate Jaylin's vaginal area and an act to lick her vaginal area with his tongue constituted separate criminal acts, even if closely connected in time. (See *People v. Harrison* (1989) 48 Cal.3d 321, 329, 334 [where defendant penetrated victim's vagina three separate times with his finger over seven to ten minute period, he committed three separate crimes].)

14

**to the jury.**

The People argue that no unanimity instruction was required because the prosecutor elected to proceed on count 2 on a theory of sexual penetration by digital penetration. (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 679 ["either the state must select the particular act upon which it relied . . . or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty"].) While the prosecutor in her argument stated that the sexual penetration in count 2 was based on digital penetration, the jury was never specifically informed of the People's "election" to proceed on count 2 based only on the digital penetration. Further, the prosecutor's argument referred to the amylase found in J.'s vestibule, which evidence provides stronger support for penetration by the tongue because amylase is found in a person's saliva. We find in light of this evidence that the prosecutor did not make a clear election on count 2 that was communicated to the jury that only digital penetration would be relied upon for this count. The question from the jury about whether use of the tongue would qualify as a penetrating device for count 2 likewise suggests that one or more jurors believed they could consider penetration with the tongue as the basis for count 2.

On similar facts, the First District in *People v. Melhado*, *supra*, 60 Cal.App.4th at page 1536 held that a unanimity instruction was required where the jury W.H. evidence of threats made at 9 a.m., 11 a.m., and 4 p.m. to prove a criminal threats charge. While the prosecutor informed the court and defense counsel that he was only relying on the 11 a.m. threat, "[t]he jury was never informed, in so many words, that the prosecutor had 'elected' to rely on the 11 a.m. event and that to convict each juror was therefore required to find that appellant had made a terrorist threat *at that time*." (*Id*. at p. 1535.) The court held that the argument by the prosecutor, even with its emphasis on the 11 a.m. threat, was not sufficient to constitute an election because the jury was not "informed that the prosecution had elected to seek conviction *only* for the 11 a.m. event, so that a finding of guilt could only be returned if each juror agreed that the crime was committed at that time." (*Id*. at p. 1536.)

15

In this case, because the prosecutor did not make a clear election to rely on digital penetration on count 2 that was communicated to the jury, the court had a sua sponte duty either to inform the jury that only the digital penetration could be considered for count 2 or to give the unanimity instruction. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 491 ["'[w]hen the prosecutor does not make an election, the trial court has a sua sponte duty to instruct the jury on unanimity'"].)

## 2. The two alleged acts of sexual penetration were not "substantially identical."

The People argue in the alternative that the court was not required to give a unanimity instruction because the evidence as to the alleged sexual acts was identical and Maddox offered the same defense to both—that he did not do them—and thus, the jury had no basis for believing one act occurred but not the other. Where two criminal acts are substantially identical, the requirement of a unanimity instruction does not apply. (*People v. Champion* (1995) 9 Cal.4th 879, 932 [no unanimity instruction required for two "virtually identical" rapes where defendant denied both rapes]; *People v. Beardslee* (1991) 53 Cal.3d 68, 93 [no unanimity instruction required where jury had to agree on facts supporting conviction of defendant as aider and abettor to murder even if some believed he was actual perpetrator]).

As our Supreme Court held in *Beardslee*, "'A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged.' [Citations.] '[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case.' [Citations.]" (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 93.) The court in *Champion* similarly found that no unanimity instruction was required because "once a juror determined that [the] defendant . . . committed one of the two rapes, it is inconceivable that the juror would not also conclude that [he] also committed the second rape of the same victim." (*People v. Champion*, *supra*, 9 Cal.4th at p. 932.)

16

In *People v. Jones* (1990) 51 Cal.3d 294, 321, our Supreme Court held that in child molestation cases, generic testimony of separate acts of molestation do not require a unanimity instruction where jurors would believe all or none of the minor's testimony. The court provided as an example, "if an information charged *two* counts of lewd conduct during a particular time period, the child victim testified that such conduct took place *three times* during that same period, and the jury believed that testimony in toto, its difficulty in differentiating between the various acts should not preclude a conviction of the two counts charged, so long as there is no possibility of jury disagreement regarding the defendant's commission of any of these acts." (*Ibid*.) The court found that "when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim."[14] (*Id*. at p. 322.)

Other courts have similarly held that a unanimity instruction is not required where there is evidence of multiple sexual acts but no way to distinguish between the acts, so "the jury could only accept or reject the defense in toto; in either case, they were compelled to reach a unanimous verdict." (*People v. Gonzalez* (1983) 141 Cal.App.3d 786, 792 [victim testified to two acts of vaginal penetration within minutes and jury could either believe or disbelieve victim where defendant claimed victim consented to both]; accord, *People v. Moore* (1989) 211 Cal.App.3d 1400, 1415-1516 [court found no reasonable basis for jury to distinguish between multiple sex acts over period of time supporting single rape conviction].)

---

[14]    In this case, the trial court did not give even a modified unanimity instruction under *Jones*, although we find on the facts here that the standard unanimity instruction was required.

However, where different defenses apply to different criminal acts, such that the jury could find the defendant guilty of the crime based on one act but not the other, a unanimity instruction is required. (See *People v. Davis* (2005) 36 Cal.4th 510, 562 [unanimity instruction required where jury could find defendant guilty of robbery for taking of car or for taking jewelry, and there was a basis on which the jury could have found that defendant was not in possession of the car or that he only committed the lesser offense of theft of the jewelry]; *People v. Gordon* (1985) 165 Cal.App.3d 839, 856 [reversible error not to give unanimity instruction for sodomy count where there was testimony of two acts of sodomy but jury may not have agreed on whether there was penetration in first or second act], disapproved on other grounds in *People v. Frazer* (1999) 21 Cal.4th 737, 765 and *People v. Lopez* (1998) 19 Cal.4th 282, 292.) As the Supreme Court cautioned in *People v. Jones*, *supra*, 51 Cal.3d at page 321, if "the evidence indicates the jurors might disagree as to the particular [sexual] act [the] defendant committed, the standard unanimity instruction should be given."

The People argue here that "the quality of the evidence as to whether appellant orally penetrated or digitally penetrated J. was identical[, and t]here was no basis for the jury to select one act over the other." We do not share this view of the evidence. While it is reasonable to assume from the verdicts that the jury believed J. and not Maddox, this does not mean that the same evidence supports the jury finding that there was penetration by *both* the fingers and the tongue. Rather, the jury could have believed J.'s testimony that Maddox touched and licked her vagina, but believed that only the tongue or fingers actually penetrated her vagina. Some jurors could have found that Maddox used his fingers to penetrate J. based on evidence of a vaginal tear. Alternatively, some jurors could have believed J.'s testimony that Maddox only touched the outside of her private parts, but that the evidence of saliva in her vestibule showed that Maddox's tongue penetrated her vaginal area.

This is therefore not the type of case envisioned by our Supreme Court in *Beardslee*, where "the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place . . . .'

18

[Citations.]" (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 93.) Given that the jurors could have believed that different criminal acts constituted the sexual penetration, Maddox was deprived of a unanimous verdict as to which criminal act he committed.

## C. *Failure to Give the Unanimity Instruction Was Not Harmless Error*

Most appellate courts have applied the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 of whether the error was harmless beyond a reasonable doubt, to determine whether the failure to give a unanimity instruction was harmless error. (See, e.g., *People v. Hernandez*, *supra*, 217 Cal.App.4th at pp. 576, 578; *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Melhado*, *supra*, 60 Cal.App.4th at p. 1536; *People v. Deletto* (1983) 147 Cal.App.3d 458, 471.) Citing to *Hernandez*, the People acknowledge in their brief that while some courts have applied the *Watson* standard for harmless error,[15] "[t]he majority of the courts that have addressed the issue have applied *Chapman*." (*Hernandez*, *supra*, at p. 576.)

As the court held in *Hernandez*: "'When the trial court erroneously fails to give a unanimity instruction, it allows a conviction even if all 12 jurors (as required by state law) are not convinced that the defendant is guilty of any one criminal event (as defined by state law). This lowers the prosecution's burden of proof and therefore violates *federal constitutional law*.' [Citation.] Because the error violates federal constitutional rights, the *Chapman* standard applies. [Citation.]" (*People v. Hernandez*, *supra*, 217 Cal.App.4th at pp. 576-577.) This analysis is consistent with the holding by our Supreme Court "that the requirement of unanimity in criminal cases is of constitutional origin."

---

[15]  In *People v. Watson* (1956) 46 Cal.2d 818, 836, our Supreme Court held that reversal for non-constitutional errors is required where it "is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

(*People v. Jones*, *supra*, 51 Cal.3d at p. 321.)  We find this analysis persuasive, and apply the *Chapman* standard of harmless beyond a reasonable doubt to the error here.

Notably, in cases involving multiple sexual acts where the courts have found it harmless error not to give a unanimity instruction, a distinguishing feature has been that the evidence was equally strong as to the sexual acts, providing no basis for the jury to distinguish between the acts.  For example, in *People v. Deletto*, *supra*, 147 Cal.App.3d 458, the court held that it was error not to give the unanimity instruction where a six-year-old testified to two separate acts of oral copulation on different occasions—one where defendant "'french kissed'" her vagina with his tongue and the other where he placed his penis in her mouth and ejaculated.  The court concluded that the acts were not identical because they were two separate acts of oral copulation, separated by time.  (*Id*. at p. 469.)  However, the court found the error harmless because there was no basis in fact or law to distinguish between the two acts, and thus "the jury must have agreed that defendant committed both unlawful acts of oral copulation."  (*Ibid*.; accord, *People v. Brown*, *supra*, 42 Cal.App.4th at pp. 1499-1501 [court erred by not giving unanimity instruction where victim testified to four separate acts of molestation but defendant was charged with a single criminal act, but error was harmless because there was no evidence from which the jury could conclude that defendant committed one molestation but not the others].)

Given the possibility that some jurors believed that Maddox's fingers penetrated J.'s vagina and some jurors believed that Maddox's tongue penetrated her vagina, this case falls squarely within the holding of *Davis* requiring a unanimity instruction "'"'if the jurors could . . . disagree [on] which act a defendant committed and yet convict him of the crime charged.'"'"  (*People v. Davis*, *supra*, 36 Cal.4th at p. 561)  We cannot find that such a constitutional defect is harmless beyond a reasonable doubt, and reverse as to count 2 on that basis.

**DISPOSITION**

20

The judgment is reversed as to count 2.  In all other respects, the judgment is affirmed.


FEUER, J.[*]


We concur:


WOODS, Acting P. J.


ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.